NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CASSANDRA W., MICHAEL S., *Appellant*s,

*v.*

DEPARTMENT OF CHILD SAFETY, E.S., MS., *Appellees*.

No. 1 CA-JV 16-0176
FILED 12-27-2016

Appeal from the Superior Court in Maricopa County
No.  JD23976
The Honorable Joseph C. Welty, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Cassandra W.*

David W. Bell, Higley
By David W. Bell
*Counsel for Appellant Michael S.*

Arizona Attorney General's Office, Tucson
By Cathleen E. Fuller
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Chief Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Samuel A. Thumma joined.

---

**B R O W N**, Chief Judge:

¶1      Cassandra W. ("Mother") and Michael S. ("Father") appeal the juvenile court's order terminating their parental rights to their two children. Mother and Father argue there is insufficient evidence in the record to support the statutory grounds for termination. Father also asserts the court erred in its best interests finding. For the following reasons, we affirm.

## BACKGROUND

¶2      Mother and Father are the biological parents of E.S., born in September 2011, and M.S., born in June 2013. Shortly after the birth of M.S., Mother sought help for "psychosis and anxiety," reporting to her therapist she was having auditory hallucinations. Mother imagined doing "bad things" to the children and would sometimes see E.S. as "possessed" or "not her child." Mother had thoughts of drowning E.S. in a bathtub and was afraid she would harm her children if she "snapped." Mother felt incapacitated for two to three months at a time when she was depressed, she had frequent thoughts of harming herself and others, and she had attempted suicide three times in her life. She also stated she had a history of depression, psychosis, and cutting herself. Mother further reported that, although she had a long history of mental illness, she had not sought treatment since 2010.

¶3      The therapist, who was a mandatory reporter, contacted the Department of Child Safety ("DCS"), expressing concern for Mother's ability to care for her children. That same day, DCS contacted Mother, who to her credit confirmed the mental health issues she had reported to the therapist and stated she had been taking care of the children daily while Father was at work. DCS took the children into care and filed a dependency petition in July 2013, alleging neglect because Mother posed a risk of harm to the children by failing to properly address her mental health issues. The petition also alleged Father failed to protect the children from risk of abuse by failing to recognize the severity of Mother's mental illness. The juvenile

court found the children dependent as to Mother in September 2013, and as to Father in May 2014, and approved a case plan of family reunification concurrent with severance and adoption.

**¶4** DCS provided both parents with reunification services, including psychological evaluations, counseling, parent-aide services, and supervised visitation. Also, Mother was to continue individual mental health counseling with her provider and take her medications. After the parents had participated in services for several months, they were reunited with the children in January 2014 on the condition that Mother would not be with them without supervision. Mother continued with her mental health treatment and began unsupervised time with the children on May 17, 2014. Several days later, however, the children's daycare provider reported that Mother had been picking up the children alone, in violation of a safety plan, and that the children were often dirty and sometimes "had an odor." DCS investigated and found M.S. had six dark circular bruises on his back and extremities and a deep scratch on the side of his face. DCS again removed the children from the parents, but continued to offer reunification services.

**¶5** In April 2015, DCS filed a motion to terminate Mother's and Father's parental rights to the children, alleging the children had been in out-of-home placement for fifteen months or longer and the parents had failed to remedy the circumstances causing the children to be in care, pursuant to Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c). The motion also alleged Mother was unable to discharge her parental responsibilities due to mental illness, under A.R.S. § 8-533(B)(3). Following a three-day severance hearing, in April 2016 the juvenile court granted the motion on each of the statutory grounds and determined that severance was in the children's best interests. These timely appeals followed.

## DISCUSSION

**¶6** To terminate a parent-child relationship, the juvenile court must determine that clear and convincing evidence exists supporting at least one ground set forth in A.R.S. § 8-533. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). The court must also find by a preponderance of the evidence that termination is in the best interests of the child. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M.*, 203 Ariz. at 280, ¶ 4. The juvenile court, as trier of fact, "is in the best position to weigh the evidence, observe the parties, judge

the credibility of witnesses, and make appropriate findings." *Id.* If reasonable evidence supports termination on any one statutory ground, we need not consider challenges pertaining to other grounds. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27 (2000).

### A. Mental Illness

**¶7** To terminate Mother's parental rights under A.R.S. § 8-533(B)(3), DCS was required to prove that Mother is unable to discharge her parental responsibilities because of mental illness and there are reasonable grounds to believe her "condition will continue for a prolonged indeterminate period." Under this statute, mental illness is any "substantial mental condition which renders the person unable to discharge parental responsibilities and which condition is likely to continue for a prolonged indeterminate period." *Maricopa Cnty. Juv. Action No. JS-5209 and JS-4963*, 143 Ariz. 178, 184 (App. 1984). "Parental responsibilities" include a wide range of obligations and the statute does not require a showing that the parent is unable to discharge *any* responsibilities. *Maricopa Cnty. Juv. Action No. JS-5894*, 145 Ariz. 405, 408 (App. 1985). Although DCS has a duty to make reasonable efforts to rehabilitate a parent suffering from mental illness before severance can be granted, it need not make efforts that do not have a reasonable prospect of success. *Mary Ellen C. v. Ariz. Dept. of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 32-34 (App. 1999).

**¶8** The juvenile court found that Mother has several mental conditions that prevent her from functioning at a level where she could properly parent. The court explained that Mother has little insight regarding her mental health and is unable to fully address it, "vehemently deny[ing] any need for appropriate treatment." Given her unwillingness to "seek treatment toward change," the court explained that Mother's mental health issues will continue to limit her ability to parent. The court also found that her continuously anxious state and the stress of the children would likely result in physical abuse. The court noted the dependency was initiated because Mother was concerned about harming the children, and the subsequent removal from the home was "based upon bruises and bite marks on the youngest child which were either the result of Mother's conduct or inattention." The court concluded that "Mother's mental health makes her defensive and unlikely to be open to improvement."

**¶9** Mother does not challenge the juvenile court's findings that she suffers from mental illness or that DCS made reasonable efforts to rehabilitate her. Similarly, Mother does not specifically challenge the court's finding that her mental illness will continue for a prolonged

indeterminate period. Instead, though acknowledging that she has struggled with mental health issues most of her life, Mother suggests such issues have largely been resolved and that the events leading to removal of the children occurred solely because of her post-partum depression. Mother also challenges the court's finding that Mother will be unable to discharge her parental responsibilities, asserting that DCS relied on "petty criticisms" of Mother's parenting style, such as using foul language and physical discipline, and carrying a knife in her purse. Recognizing it is not our role to reweigh the evidence, we conclude that the record supports the court's findings.

¶10        Mother is correct in stating that the DCS caseworker was unfamiliar with some of the details of her then-current mental health condition and her participation in various services at the time of the severance hearing. However, the caseworker's testimony, along with other evidence in the record, supports the juvenile court's findings. Mother acknowledged she has a long history of mental health issues and has been diagnosed with borderline personality disorder, bipolar disorder, anxiety disorder and schizophrenia. In December 2014, psychologist Marta DeSoto, Ph.D., performed a psychiatric evaluation of Mother. Dr. DeSoto testified that Mother's disorders caused her to focus on her own needs over those of her children and she had poor frustration tolerance and impulse control. Dr. DeSoto noted that Mother had limited insight on how her illness affects her children and was unable to gauge her own abilities as a parent. Dr. DeSoto also testified Mother was defensive of her behaviors and minimized her past mental health issues.

¶11        In September 2015, psychologist Ellen Diana, Ph.D., completed a bonding assessment with the parents. Dr. Diana testified that Mother displayed "very poor boundaries" and downplayed her mental health diagnoses, stating that many people have the traits she has and she does not view them as signs of instability. When Dr. Diana asked Mother about why the children were taken into care, Mother reported that she had had post-partum depression that was "blown out of proportion." Dr. Diana testified that although mental health issues are not necessarily a barrier to parenting, Mother "fails to grasp the significance" of her issues and is unwilling to change. Mother testified that she has mental health issues and admitted that at the time she first sought help following the birth of M.S., she had been afraid she might harm her children. She also stated, however, that her issues at that time had not been serious, and she denied that her mental health has ever impacted her parenting.

**¶12** Mother's participation in services was inconsistent. DCS provided Mother various services, including individual counseling and parent aide services. As of the time of the severance hearing, Mother had not attended a counseling appointment since October 2015. She also failed to participate in counseling from July through September 2015, and admitted during the hearing that she had recently been sporadic in her mental health services participation. The March 2015 progress report to the juvenile court indicated that Mother's mental health provider believed she was not taking her medications at that time. Mother also willfully refused to comply with the court's order to submit to a hair follicle test.

**¶13** The juvenile court accepted Mother's explanation that she had been in a serious car accident and was therefore unable to attend certain visits and appointments in October and November 2015. However, the record shows that Mother missed 19 out of her 40 most recent visits that included parent aide services—more than what would be considered reasonable during the timeframe when she was injured. Also, Mother's counseling notes indicate that she had been missing counseling appointments because she had been acting as "chauffeur for her friends." Mother's behavior during her most recent visits demonstrated her continued inability to appropriately control her anger and frustration when dealing with the children. Mother also repeatedly used inappropriate language at the visits in front of the children and carried a knife in her purse, despite having agreed not to use such language or bring weapons during visits.

**¶14** Given Mother's long history of untreated and unresolved mental illness, erratic behavior, inconsistent record of participating in services, and tendency to minimize and defend her inappropriate behavior, reasonable evidence supports the juvenile court's order terminating Mother's parental rights under the mental illness ground, A.R.S. § 8-533(B)(3).

### B. Out-of-Home Placement

**¶15** The juvenile court terminated Father's rights under A.R.S. § 8-533(B)(8)(c), which required DCS to prove (1) the children had been in an out-of-home placement for at least fifteen months; (2) appropriate reunification services were provided; (3) Father has been unable to remedy the circumstances causing the placement; and (4) there is a substantial likelihood that Father will be unable to exercise proper and effective parental care and control in the near future.

¶16 Father contends the juvenile court erred in finding that DCS made diligent efforts to provide him with appropriate reunification services. Although DCS must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child, it need not provide "every conceivable service." *Mary Ellen C.*, 193 Ariz. at 192, ¶ 37.

¶17 Over the course of more than two years, DCS provided Father with a psychological evaluation, anger management counseling and individual parent aide services designed to help him learn to parent on his own. Addressing Father's lack of participation in the services offered, the juvenile court found that

> Father has failed and/or refused to meaningfully engage in services to address barriers to family reunification. Father refused to participate in anger management counseling. Father participated with parent [aide] visitation but missed several visits. During those he did attend[,] he often deferred parenting decisions to Mother, and never took steps to redirect the children or confront Mother when she was being inappropriate with the children. Father had an opportunity to benefit from the suggestions from the Parent [Aide] but did not. Father remained at all times deferential to Mother and permitted himself to be belittled and bullied by Mother. Father participated in the psychological evaluation but took no meaningful steps to address the findings of the psychologist.

¶18 As alleged in the dependency petition, from the outset of this case, DCS's primary concern relating to Father was his failure to protect the children from potential abuse by Mother because he failed to recognize the seriousness of her mental illness. Father does not identify what services DCS should have provided that would have assisted him in acknowledging and recognizing the impact of Mother's mental illness on him and the children. Given his unequivocal position that Mother had no mental illness problems, as Dr. Diana opined, even if DCS had offered "every . . . conceivable service" at the highest level possible it would be substantially unlikely that the parents would change. Despite the various services offered by DCS, Father continued to display an inability to parent independently and an unwillingness to stand up to Mother for the benefit of his children, as evidenced by the psychological evaluation, bonding assessment, and his own testimony at the severance hearing. The juvenile

court did not err in finding that DCS made diligent efforts in providing appropriate reunification services to Father.

¶19            Father argues that DCS failed to show he "had any deficiencies that make him incapable of exercising proper and effective parental control in the near future." The record indicates otherwise. In July 2013, before the children were removed, Mother reported to her therapist that she had told Father of her thoughts about harming the children, but that he did not want to hear about it. In May 2015, Father participated in a psychological evaluation with Dr. DeSoto. The resultant report indicated that Father believed Mother had been addressing her mental illness and it was "no longer an issue," despite the fact that Mother had not been regularly participating in counseling. Dr. DeSoto recommended individual supervised visits for Father with the children so his parenting could be assessed without Mother present. However, the DCS case manager testified that Father missed several of his scheduled parent aide visits and Mother usually accompanied him to the ones he did attend.

¶20            The record also shows that Father usually deferred to Mother when parenting, even when her conduct was inappropriate or dangerous to the children. During a portion of the bonding assessment, Mother was turning the children upside down and tickling them while they were eating. Father told Mother to "let them eat," but did not seem to recognize or convey to Mother that her behavior was unsafe and could cause the children to choke. Dr. Diana noted Father allowed Mother to frequently talk over him and that she made comments which were belittling to him. Dr. Diana testified that, although Father seemed to have "better instincts" regarding appropriate behavior for the children than Mother did, he was "largely ineffective" in communicating his concerns to Mother. Based on these observations, Dr. Diana opined that she did not believe Father could protect the children from risk of abuse by Mother.

¶21            At the severance hearing, Father denied that Mother's mental health issues had affected her parenting in the past and stated that he knows more about her mental health than the doctors who treat her. Father also showed little interest in severing ties with Mother for the benefit of the children. Although Father claimed he had separated from Mother three months prior to the severance hearing, they were holding hands at court on the second day of the trial, and he indicated through testimony they may reconcile. Given the length of this dependency and Father's sustained failure to recognize the danger Mother's mental illness poses to the children, reasonable evidence in the record supports the court's finding that

Father will be unable to exercise effective parental care and control in the near future.

### C.     Best Interests

**¶22**     Father also challenges the juvenile court's finding that terminating his parental rights to the children is in their best interests.  To establish that termination is in a child's best interests, the court must find that "the child will benefit from termination of the relationship or that the child would be harmed by continuation of the parental relationship." *James S. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 351, 356, ¶ 18 (App. 1998). Evidence showing a child is adoptable is sufficient to satisfy a finding that the child would benefit from the termination of parental rights.  *Maricopa Cty. Juv. Action No. JS–501904*, 180 Ariz. 348, 352 (App. 1994).  In addition, the juvenile court may also consider whether the child's existing placement is meeting the child's needs.  *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998).

**¶23**     The record shows that the children's current placement is meeting their needs and is willing to adopt both of them.  Further, the record supports the juvenile court's finding that the children are likely to be harmed by the continuation of their relationship with Mother and Father because Father is unable to recognize the danger Mother poses to them. DCS met its burden of establishing that termination is in the children's bests interests. [1]

### CONCLUSION

**¶24**     The juvenile court's order terminating Mother's and Father's rights to their two children is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[1]     Although not challenged by Mother, the record also supports a best interests finding as to her.