NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

LISA S., BRIAN W., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, R.W., F.W., *Appellees.*

No. 1 CA-JV 18-0436
FILED 5-2-2019

---

Appeal from the Superior Court in Maricopa County
Nos.  JD32477
JS19635
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

---

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant Lisa S.*

The Stavris Law Firm, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant Brian W.*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Kenton D. Jones joined.

---

**C R U Z**, Judge:

¶1 Lisa Louise Satterfield ("Mother") and Brian Tallchief Waldon ("Father")[1] (collectively "Parents") challenge the superior court's severance of their parental rights to their two minor children, R.W. and F.W. Mother challenges only the statutory grounds for severance, and Father challenges the court's best-interests findings. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 Mother and Father are parents to R.W., age six, and F.W., age three. Parents' history with the Department of Child Services ("DCS") dates back to 2014, when DCS investigated the first allegation of child neglect. DCS found the allegation to be unsubstantiated, but nevertheless observed Father smoking marijuana on the front porch while holding R.W.; the home was pervaded by a foul odor; and the family dog consistently urinated on the floor, which was never properly cleaned — a fact especially alarming due to the fact that R.W. often played on the unsanitary floor.

¶3 In February 2016 DCS found an allegation of substance abuse and inadequate child care to be substantiated after F.W. tested positive for marijuana at birth. Mother admitted to using marijuana throughout her pregnancy with F.W. Some weeks later, F.W. was admitted to the hospital and diagnosed with "failure to thrive" — F.W. weighed more at birth than he did roughly seven weeks later. F.W. vomited frequently at the hospital; Parents acknowledged he had been spitting up much of what he ate. F.W. spent several days in the hospital and upon discharge DCS took custody of both children.

---

[1] Father is an enrolled member of the Cayuga Nation. Father stipulated, however, that the Indian Child Welfare Act does not apply to this case.

¶4        On DCS' motion, the children were adjudicated dependent in April 2016.  In its order, the court found that Mother and Father were unfit by reason of medical neglect, and that their marijuana substance abuse issues rendered them unable to adequately parent.  Additionally, the court found Mother unfit to parent "due to mental deficiency and neglecting to properly treat her mental health."  The court noted that despite reporting she had ADHD, depression, anxiety, and that she was "special needs" at a young age, Mother did not seek treatment.

¶5        During this first dependency proceeding, DCS Program Supervisor Kari McBride described Parents as having Cannabis Use Disorder.  Thereafter, however, Parents achieved and maintained sobriety, and successfully completed the services offered by DCS: Parent-Aide, urinalysis testing, substance abuse treatment, family reunification, psychological evaluations, and counseling.  Additionally, Parents demonstrated an understanding of how marijuana abuse negatively affected their parenting.  At this same time, F.W. was provided with multiple services, including doctor appointments, "GoodFit" human development services, and Division of Development Disabilities services.  F.W. "made substantial growth" over a short period of time after beginning these services, achieving "a much better level of stability and age appropriate milestones."

¶6        Because of Parents' clear progress and F.W.'s marked improvement, the court terminated the dependency proceedings in December 2017, but DCS continued to provide services for F.W.  Upon notice of such termination, but before termination went into effect, Father reached out to F.W.'s service providers to cancel all future appointments and close out the services—Father "stated that he [did] not feel that [F.W.] ha[d] any speech or any other developmental delays and [was] not in need of services."  The provider's report reflected that F.W. did in fact exhibit developmental delays.  In addition to abandoning services for F.W., Parents also abandoned sobriety—they immediately began smoking marijuana again.

¶7        In March 2018, DCS discovered Mother had obtained a medical marijuana card, and investigated allegations that Father smoked marijuana in front of the children, that the home was infested with cockroaches, and that Mother had slapped R.W. across the face and knocked the child out of a chair. DCS Investigator Angela Nilssen went to Parents' house, but no one answered.  She thereafter contacted them and set up an appointment for the following day.  She testified that when she arrived, the house smelled like chlorine or bleach as if it had just been

cleaned. Parents denied the allegation of physical abuse; Mother admitted to smoking marijuana three times per day but denied smoking around the children; Father denied smoking marijuana at all but refused to provide a hair follicle for testing. Parents acknowledged the roach infestation but provided Nilssen a receipt showing they had just had their house "bombed" to get rid of the roaches. Nilssen discovered F.W. had a broken tooth that Parents could not explain.

¶8        Roughly two weeks later, Father submitted to urinalysis testing and tested positive for marijuana. Although he initially claimed the test must have been positive due to him being near Mother when she smoked, he later admitted to using marijuana to self-treat carpal tunnel syndrome; Father claimed he lied because he "was nervous and afraid" of "being confronted" by a DCS official.

¶9        In May 2018, Nilssen interviewed R.W. at school in response to another complaint filed against Parents. R.W. told Nilssen that Father sometimes put her in a box with diapers—the complaint alleged dirty diapers—and that marks on her body were from Mother burning her with cigarettes. Father acknowledged that R.W. had told him about Mother burning her with cigarettes and stated he had confronted Mother about it; Mother denied doing so intentionally and denied any such conversation with Father. R.W. further disclosed that Father would sometimes put her inside a box and tape it shut, and at other times he "would place her inside a poop trash container." Father denied these allegations.

¶10       The children were again removed from Parents' custody and a rash that appeared raw and unattended to was discovered on each child's buttocks. Father testified to knowing about the rash and choosing to treat it at home—an action consistent with Father's expressed belief that even if medical professionals state that his children need professional attention, "I am a parent and I deserve to have that bond with my kid and to recognize his own problem if there is a problem going on." Regarding F.W.'s special needs,[2] Father was adamant that if he did not recognize any problem, then F.W. requires no services—Father stated that because he is a parent, he is "in a better position to assess what services or delays [his] child has than" any doctor or speech, occupational, or physical therapist.

---

[2]        Father seemed to misunderstand the term "special needs" as applied to F.W., testifying that "there's no special needs because [F.W. is] very intelligent for his own age."

¶11         DCS moved for severance of Mother's and Father's parental rights.  At trial, Mother did not testify.  Father testified that Mother moved out roughly a month-and-a-half before trial, and that he intended to "parent on [his] own."   However, Father also stated that "Mother would still be involved in [the children's] lives" and they would "co-parent," because he believed there were no issues with Mother and her parenting of the children.  Father stated he would participate in services for his children if ordered to; he expressed, however, his firm belief that he had never done anything harmful or that put the children at risk and stated that he did not believe any of the services were necessary for him or the children.  Father expressed further distrust of medical professionals when he testified that even prior to receiving his medical marijuana card, he self-treated with marijuana rather than seeing a doctor for his pain because he "didn't want to consult with anybody" but "wanted to do it on [his] own."

¶12         The court granted DCS' severance motion in an October 2018 order.  Mother and Father timely appealed.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") §§ 8-235, 12-120.21(A)(1), and -2101(A)(1).

**DISCUSSION**

¶13         Mother challenges the statutory grounds of the severance; Father challenges the court's best-interests findings.  We address each argument in turn.

I.       Statutory Grounds

¶14         Mother specifically challenges that DCS did not sufficiently prove she "is currently unable to discharge parental responsibilities" pursuant to A.R.S. § 8-533(B)(11)(d).  "Evidence sufficient to justify the termination of the parent-child relationship shall include any one of the" grounds enumerated in A.R.S. § 8-533(B).  Absent clear error, we accept the findings of the superior court on review, *Maricopa County. Juvenile Action No. JS-4374*, 137 Ariz. 19, 21 (App. 1983), because that court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

¶15         Mother argues DCS failed to prove by clear and convincing evidence that she was "currently unable to discharge parental responsibilities."  A.R.S. §§ 8-533(B)(11)(d), -537(B); *see Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005).  This court has previously recognized "parental responsibilities" as "capable of being understood by persons of

ordinary intelligence as referring to those duties or obligations which a parent has with regard to his child," *Maricopa County Juvenile Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 185 (App. 1984); furthermore, "[t]he term is not intended to encompass any exclusive set of factors but rather to establish a standard which permits a trial judge flexibility in considering the unique circumstances of each termination case before determining the parent's ability to discharge his or her parental responsibilities." *Maricopa Cty. Juv. Action No. JS-5894*, 145 Ariz. 405, 409 (App. 1985).

¶16        In its findings and conclusions of law, the court took note of F.W.'s failure to thrive diagnosis; "safety issues regarding [Parents'] use of marijuana"[3]; Parents' choice to immediately close F.W.'s developmental services at the conclusion of the first dependency; Parents' failure to meaningfully participate in services during the second dependency; Parents' failure to provide adequate medical services to their children, and their apparent belief that, contrary to the opinions of various professionals, F.W. does not need any developmental services—and particularly Father's expressed belief that he knows better than medical professionals; and F.W.'s tendency to regress when in Parents' custody.

¶17        Each of these findings and conclusions are supported by the record (except as indicated in footnote 3) and reflect an inability to discharge parental responsibilities. Upon review of the record, we hold that ample evidence supports the court's conclusion that DCS proved the § 5-833(B)(11) ground for termination by clear and convincing evidence.

II.        Best Interests

¶18        In addition to its finding of one of the A.R.S. § 8-533(B) factors, the court "shall also consider the best interests of the child." A.R.S. § 8-533(B). The court may find that DCS has met its burden of proof if a preponderance of the evidence demonstrates that "termination is in the child's best interests if *either*: (1) the child will benefit from severance; *or* (2) the child will be harmed if severance is denied." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018) (emphasis added) (citation

---

[3]        Section 36-2811(B) provides that medical marijuana card holders are "not subject to arrest, prosecution or penalty in any manner, or denial of any right or privilege, including any civil penalty or disciplinary action by a court or occupational or professional licensing board or bureau." Because the record does not reflect the manner in which Parents' legal use of marijuana negatively affected their parenting, we address only the other bases for severance.

omitted).  The court must look to the totality of the circumstances in making its determination.  *Id.* at 150-51, ¶ 13 (citation omitted).

**¶19**            DCS Program Supervisor McBride testified that severance is in the best interests of both children, stating:

> These are both very young children who have been out of care for a significant period of their life.  [F.W.] has some significant needs.  Both of these children need a stable, sober, permanent home environment.  This is their second dependency in a very short period and they need that permanency so that they can continue to develop and meet these milestones so we can reach the point where they can . . . become successful older children, young adults, and progress. . . . [Without severance, t]he concern would be that we would continue to have children languishing in out-of-home care.  We would have uncertainty regarding their permanency plan, regarding the home that they're going to go to, if it's a safe home . . . a sober home, and . . . is going to be able to meet all of their needs long-term.

Ms. McBride further testified that each child is placed in a home committed to permanent adoption; that R.W. is "doing amazing" in her current home and showing marked progress; and that F.W. is in a home that "has shown they have in the past and are currently able to meet all of" F.W.'s special needs.

**¶20**            The court was persuaded by this testimony, finding that "[t]he children are currently each in adoptive placements willing and able to meet all of their needs"; "[b]oth children are considered adoptable"; and that "[t]he children deserve a home free of substance use and a safe and stable living environment."  These findings satisfy the disjunctive prong requiring DCS prove a benefit to the children from severance.  The record does not support Father's position that the court's best-interests finding was in error.

## CONCLUSION

**¶21**		We affirm the superior court's order granting DCS' severance motion as to both Mother and Father.



AMY M. WOOD • Clerk of the Court
FILED:  AA