NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ELLESSE J.,
*Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, O.H., J.H., A.H.,
*Appellees*.

No. 1 CA-JV 17-0182
FILED 12-14-2017

Appeal from the Superior Court in Maricopa County
No. JD511152
The Honorable Karen L. O'Connor, Judge

**VACATED; REMANDED**

COUNSEL

Denise L. Carroll, Esq, Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Cathleen E. Fuller
*Counsel for Appellee DCS*

_____

## MEMORANDUM DECISION

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

_____

**J O H N S E N**, Judge:

¶1        Ellesse J. ("Mother") appeals the superior court's order severing her parental rights to her three children.  Because the superior court based its decision on an erroneous finding of fact, and the record does not clearly show that the court would have reached the same result absent the error, we vacate the severance order and remand for proceedings consistent with this decision.

### FACTS AND PROCEDURAL BACKGROUND

¶2        In June 2013, one of Mother's children, then six months old, suffered a broken femur while in the care of the children's father ("Father").[1] Father took the baby to the hospital and reported that the child had suffered the injury in a fall from a swing, but a doctor suspected Father had injured the baby.  The Department of Child Safety ("DCS") suspected that the baby's broken leg and several unexplained burns and unexplained marks on the other child were caused by abuse.  DCS also suspected Father abused Mother, who had bruises and other injuries to her face and torso; Mother attributed her injuries to swimming and to attacks by unknown persons during two home invasions.

¶3        DCS took temporary custody of the children and placed them with the maternal grandparents, then filed for dependency against both Mother and Father in July 2013; the superior court ruled the children dependent in January 2014.

¶4        DCS's initial plan was to reunify Mother with the children. Mother positively interacted with them throughout the dependency,

_____

[1]        At the time, Mother and Father had two children, both under the age of two.  Mother bore a third child in June 2014, and the superior court ruled that child dependent later that year.  Father's parental rights to the children were severed after he failed to appear for the severance trial, and he is not a party to this appeal.

successfully completed parent-aide services, and was permitted to have unsupervised contact with her children. DCS had remaining concerns, however, that Mother would subject the children to abuse by continuing her relationship with Father; in 2015, DCS reported that Mother still was in phone contact with Father and occasionally gave him rides. In March 2015, DCS moved to terminate Mother's parental rights with her two older children on the grounds of 15 months' time-in-care, alleging that Mother had failed to acknowledge Father's domestic violence and had continued her relationship with him.

¶5 In September 2015, DCS withdrew the motion and again attempted to reunify Mother with her children, but required Mother to participate in individual counseling to address co-dependency issues and develop coping skills. When DCS told Mother she needed to attend counseling, she initially refused but later acquiesced when pressed to do so during a court hearing. Mother began counseling and was receptive to treatment, but she missed several sessions before the beginning of 2016 and her counseling had to be extended. After DCS approved the extension, Mother attended counseling sessions fairly regularly for a few months, but then her attendance once again became sporadic: Between May and September 2016, she attended only one session. Mother blamed her inconsistent attendance at counseling on conflicts with her work schedule.

¶6 DCS assigned Mother a family reunification team in early 2016. When Mother did not return the team's initial calls, they went to her home and found that she was being evicted. After the team eventually got in contact with Mother, she told DCS that she intended to find new housing, and later she said she had placed a deposit and would move into a new home in June. When DCS checked on her progress, she said she had delayed the move to July, and later told the caseworker she had delayed the move again to August to accommodate a family trip.

¶7 On August 4, 2016, Mother went to meet with Father to ask him to sign some paperwork committing him to pay $250 per month in child support. After she presented him with a contract she had written for him to sign, he became agitated. The encounter escalated, and Father assaulted Mother, taking her to the ground twice and punching her. Mother's injuries from the assault—a small abrasion and swelling to her forearm and a scrape to her knee—were serious enough that she missed a day of work.

¶8 After that, Mother informed DCS that she was no longer interested in living by herself and instead was moving in with a family

member because Father had assaulted her. DCS was concerned that Mother had shown poor decision-making by meeting with Father. Because of that concern, and because Mother had failed to obtain stable housing and had failed to regularly attend counseling, DCS concluded the case plan should be changed back to severance and adoption. The court did so, and DCS petitioned for severance on October 3, 2016.

¶9            After the filing of the petition for severance, Mother attended three counseling sessions in October, but attended only three of six counseling sessions in November and December, canceling or no-showing the other three. Over the course of the entire proceedings, Mother attended 26 counseling sessions but also missed almost that many. She met only about half of the treatment goals; in her counselor's opinion, Mother needed 10 to 15 more sessions to meet the remaining goals. According to the counselor, without further counseling, Mother is likely to continue to exercise poor judgment, possibly exposing the children to further domestic violence at the hands of Father. Because of Mother's inconsistent attendance, however, the counselor and Mother's caseworker agreed to put counseling on hold in March 2017.

¶10            During the dependency, Mother was evaluated twice by psychologist Dr. James Thal, who in both evaluations concluded that Mother's parenting could subject the children to risks of abuse. In Mother's first evaluation in November 2013, Thal concluded that Mother was impulsive and "may believe that aggressiveness is a legitimate means to an end." Thal's conclusions about Mother's parenting abilities, however, largely centered around her relationship with Father. Thal reported that he "did not identify stress factors" in Mother's own relationships with her children, but concluded she could put her children at risk now and in the future by supporting and remaining in an abusive relationship.

¶11            In the second evaluation in February 2017, Thal noted Mother's history of aggressive conduct and the August 2016 confrontation with Father, and concluded that Mother "appears to have difficulty moderating her aggressive impulses" and was "inclined to exercise poor judgment," which "combined to interfere with her ability to safeguard and protect her children." In Thal's opinion, Mother had not demonstrated adequate parenting skills, so that children in her care "could be at risk for exposure to domestic violence." Thal's prognosis for Mother being able to adequately parent in the near future was "guarded," and he found it "reasonable to believe that the condition will continue for a prolonged, indeterminate period of time."

4

¶12 After a two-day severance hearing in March 2017, the superior court terminated Mother's parental rights on the ground of 15 months' time-in-care under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c) (2017).[2] We have jurisdiction over Mother's timely appeal under A.R.S. §§ 8-235(A) (2017), 12–120.21(A)(1) (2017) and –2101(A)(1) (2017).

## DISCUSSION

### A. Legal Principles.

¶13 We review a severance order for abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). Before it may sever a parent-child relationship, the superior court must find by clear and convincing evidence at least one ground for severance set out in A.R.S. § 8-533(B), *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000), and by a preponderance of the evidence that severance serves the child's best interests, *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). "Because the juvenile court is in the best position to weigh evidence and assess witness credibility, we accept the juvenile court's findings of fact if reasonable evidence and inferences support them, and will affirm a severance order unless it is clearly erroneous." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016) (citation omitted). "A factual finding is clearly erroneous if no substantial evidence supports it," *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 189, ¶ 58 (App. 2008), or "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Lupe*, 181 Ariz. 211, 213 (App. 1994) (quotations omitted). "Evidence is substantial if it allows a reasonable person to reach the trial court's result." *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 52, ¶ 11 (App. 2009) (quotations omitted). We therefore examine whether "reasonable evidence in the record supports the juvenile court's findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 283, ¶ 16 (App. 2002).

¶14 In reviewing a parental severance, we are mindful of the gravity of the parent-child relationship. Control and custody of one's children is a fundamental right that "'does not evaporate simply because' the natural parents 'have not been model parents or have lost temporary custody of their child to the state.'" *Maricopa County Juv. Action No. JS-500274*, 167 Ariz. 1, 4 (1990) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753

---

[2] Absent material revision after the relevant date, we cite a statute's current version.

(1982)). Accordingly, "termination of parental rights is not favored and . . . generally should be considered only as a last resort." *Id.* (citing *Maricopa County Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 189 (App. 1984)).

## B.     Time-in-Care Ground for Severance.

**¶15**          Under the 15-month time-in-care ground for severance, parental rights may be terminated if (1) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order," (2) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The circumstances at issue are "those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007) (quotation omitted).

**¶16**          The superior court found that DCS had established by clear and convincing evidence grounds for severing Mother's parental rights, based on facts showing the children had been in out-of-home placement since 2013 and 2014; Mother had attended only one counseling session between May and September 2016; Mother had delayed for several months in obtaining housing between April and August 2016, resulting in the family reunification team closing out unsuccessfully; her August 2016 confrontation with Father, in which he assaulted her; and the psychologist's evaluations of Mother. The court concluded that despite DCS's diligent efforts to reunify Mother with her children for four years, Mother had failed to show that she is able to provide a safe home for the children.

**¶17**          On appeal, Mother challenges the court's findings that she was unable to remedy the circumstances causing the children to be taken into care and that she will not be capable of effectively parenting in the near future. According to the record, Mother frequently visited the children at the home of her own father ("Grandfather"), who had cared for the children since the beginning of the dependency. Mother stayed with the children there overnight and assisted Grandfather in caring for them. Mother points to Grandfather's testimony that she is "fully capable" of taking care of the children alone; testimony from her prior caseworker that he had no concerns about Mother's ability to parent her children directly; her successful completion of parent-aide services and near-completion of other DCS-provided services; her current stable home with her brother; and her

effort to resolve the risk of abuse that necessitated DCS's involvement in the first place by ceasing contact with Father.

**¶18** Even assuming that this evidence supports a finding that Mother can effectively parent the children, it is insufficient to disturb the superior court's decision. "Factual findings are not clearly erroneous if substantial evidence supports them, even if there is substantial conflicting evidence." *In re U.S. Currency in Amount of $26,980.00*, 199 Ariz. 291, 295, ¶ 9 (App. 2000). The evidence Mother cites conflicts with other substantial evidence supporting the court's finding that Mother had not shown she could provide the children a safe environment. For example, the caseworker testified that Mother had failed to remedy the circumstances that caused the out-of-home placement because, among other things, Mother was "inconsistent with her individual counseling," demonstrated poor judgment in meeting with Father in August 2016, and failed to acknowledge the past domestic violence as a concern. In addition, both the examining psychologist and Mother's counselor stated that a child in her care could be at risk for domestic violence due to Mother's failure to resolve impulse-control and judgment issues through counseling. The court could reasonably conclude from this evidence that Mother could not effectively parent.

**¶19** Likewise, based on the psychologist's opinion, the court could reasonably conclude that it was likely that Mother would not be able to effectively parent in the foreseeable future. To be sure, the court also heard evidence that Mother had improved as a parent and poses less risk of abuse to the children than in the past. For example, Grandfather testified that Mother had made great strides as a parent and had not communicated with Father other than the ill-fated attempt in August 2016 to obtain child support from him, and evidence also showed that she had called the police on Father after the August 2016 assault, was cooperating in the investigation and prosecution of the assault, and had obtained a protective order against Father. The court also heard evidence that Mother is employed and since 2016 had stable housing with her brother. Finally, the evaluating psychologist testified that Mother may possibly be able to adequately parent in the future. But while this evidence suggests a possibility that Mother may become an effective parent, it does not negate the psychologist's continuing concern. In the end, it is the role of the superior court to evaluate and resolve the conflicting evidence on this issue and, on this record, we will not disturb the court's decision in this regard.

## C.     Best Interests of the Children.

**¶20**          "[T]ermination of the parent-child relationship is in the child's best interests if the child would be harmed if the relationship continued or would benefit from the termination." *Demetrius L.*, 239 Ariz. at 4, ¶ 16 (quotation omitted).  Therefore, "a determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Juv. Action No. JS-500274*, 167 Ariz. at 5 (emphasis omitted).

**¶21**          In support of its conclusion that severance was in the best interests of the children, the superior court wrote:

> THE COURT FINDS that DCS has proven by a preponderance of the evidence that termination of the parent-child relationships is in the children's best interests.  Mother had opportunities to address her relationship issues for almost four years.  She has chosen to not fully engage in those services.  She has not demonstrated that she has insight or understands the effects of domestic violence on her children. Given Mother's domestic violence history and lack of success with reunification services, the children are at risk of emotional and/or physical harm if returned to Mother today. The children have been in the foster care system for too long. They have the right to a permanent and stable home where all of their needs are met.  They have lived with maternal grandfather for almost four years.  Maternal grandfather is an adoptive placement and is meeting all of the children's needs. If maternal grandfather is unable to adopt, the children are otherwise adoptable. The current placement is the least restrictive placement.

**¶22**          It is undisputed that at the time of the severance hearing in 2017, Grandfather was providing for the children's needs and had been doing so for several years.  Grandfather had custody of Mother's older two children since 2013, and the youngest since a month after he was born in 2014.  Caseworkers reported that Grandfather provides "a safe and family centered environment" for the children, and that in his care, the children are generally active, healthy, well-behaved, and developing normally. Grandfather testified that the children were "normal rambunctious little boys" who were developing normally and "doing great."

¶23        No substantial evidence, however, shows that Grandfather is "an adoptive placement" for the children.  To the contrary, the evidence showed Grandfather was unsure about whether he was willing to adopt the children.  Outside the courtroom during trial, Grandfather told the children's caseworker that he was unsure whether he was going to adopt the children, and the DCS caseworker testified that although the children are adoptable, no adoptive home had been identified, and the placement with Grandfather was a "non-adoptive placement."  Grandfather likewise testified that "[i]t's not my preference to raise someone else's children" and that he told Mother on several occasions, "I'm too old for this.  I don't think I can do it.  And if it gets to [a severance], I don't know what decision I'm going to make, you know."  Grandfather testified that Mother is significantly involved in caring for the children and could effectively parent, and he preferred that the children be returned to her.

¶24        Grandfather's other testimony suggests he was willing to continue to care for the children in some other capacity, rather than adopt them.  He responded "yes" when asked, "if the Court decides . . . to sever Mother's parental rights, will you have the ability to continue to take care of the children?"  He stated that he will look for employment that "will enable me to do what I need to do for the grandkids."  He suggested that he had not ruled out adoption; when asked, "if you were to adopt, you would not prevent [Mother] from being able to see the children," Grandfather said, "No, I wouldn't.  I would keep it just as it is now."  But at no time did Grandfather state or suggest that he had decided to adopt the children.  When DCS recalled the caseworker to testify after Grandfather had testified, the caseworker again stated that the children were not currently placed in an adoptive home.

¶25        Based on this record, the superior court erred by finding Grandfather was willing to adopt the children.  The issue therefore is whether we can presume the court would have come to the same best-interests conclusion, absent that finding.  As the superior court noted, the children had been in care for far too long, but throughout that time, Grandfather had provided a safe and secure environment in which they were doing well.  On this record, severance seemingly would require the children to be transitioned to a different and unknown placement.

¶26        In a different legal context—a criminal sentencing—appellate courts occasionally must decide whether to vacate a ruling by the superior court when the court has exercised its discretion based on multiple factors, one of which proves on appeal to be unsupported by the record or legally erroneous.  In that context, we affirm the superior court's ruling "only

where the record clearly shows the trial court would have reached the same result even without consideration of the improper factors." *State v. Ojeda*, 159 Ariz. 560, 561-62 (1989). In *Ojeda*, our supreme court vacated an order revoking probation and imposing a prison sentence because two out of three bases for revocation were unsupported by the record. *Id*. at 560-61. Even though it found there that the superior court had the power to revoke probation and impose the same sentence on the lone proper basis, it declined to affirm, reasoning that doing so would "prevent[] the trial court from deciding whether it would have disposed of the probation violation differently had it been presented with only the legitimate [bases for revocation]." *Id.* at 561.

¶27          Here, we apply the same rule for the same reason, because we cannot discern from the record whether the superior court would have reached the same conclusion about the children's best interests, absent its erroneous finding about Grandfather as a permanent placement. In the first place, the finding that Grandfather was willing to adopt the children was highly probative; a finding of an existing adoptive placement carries so much weight that, in and of itself, it can be sufficient to support a finding that severance is in the best interests of the children. *See Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 335, ¶ 8 (App. 2004) ("In combination, the existence of a statutory ground for severance and the immediate availability of a suitable adoptive placement for the children frequently are sufficient to support a severance order."). Given the weight accorded to such a finding, its absence may shift the balance toward denying severance.

¶28          Second, as noted, the record contains substantial evidence that the children would continue to do well in Grandfather's care if the court were to decide to allow Mother additional time to demonstrate she is able to adequately parent. The record does not show that it would be futile to delay a ruling on severance. The court heard evidence suggesting that Mother may become capable of effectively parenting in the foreseeable future, including her positive interactions with her children and her significant involvement in the present situation under which the children are thriving; her new housing arrangement with her brother; the fact that she is employed; her progress in counseling when she attends; the fact that she needs only 10 to 15 more sessions to successfully complete counseling; the psychologist's testimony that she may be able to adequately parent in the future; the fact that she reported Father's August 2016 assault to police and cooperated with the investigation and prosecution; and her lack of contact with Father since that assault and the protective order she has against him. On this record, it appears that absent the court's mistaken

finding, it could have reasonably concluded that the children's best interests favored giving Mother more time to demonstrate parental fitness.

¶29        As support for its best-interests finding, the superior court also noted that the children are adoptable.  *See Demetrius L.*, 239 Ariz. at 3-4, ¶ 12 ("best interest requirement may be met if the petitioner proves . . . that the child is adoptable").  But nothing in the record would require the superior court to find the best-interests requirement satisfied based on that finding alone.  At the same time, given the apparent absence of another family member willing or able to adopt, the superior court must consider whether severing Mother's parental rights would unnecessarily deprive the children of an environment in which they are now together and doing well.

## CONCLUSION

¶30        The evidence supports the superior court's finding that DCS proved the statutory grounds for severance based on 15 months' time-in-care.  The record does not clearly show, however, that the court would have found that severance was in the children's best interests absent its finding that Grandfather was an adoptive placement.  Accordingly, we vacate the order severing Mother's parental rights and remand so that the superior court may reconsider whether severance is in the children's best interests.  We express no view of the merits of that decision on remand.

