NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DENISSE P., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.P., L.P., J.P., N.P., *Appellees.*

No. 1 CA-JV 18-0297
FILED 2-14-2019

Appeal from the Superior Court in Maricopa County
No. JD30083
The Honorable Randall H. Warner, Judge

**AFFIRMED**

COUNSEL

Maricopa County Office of the Legal Defender, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Kenton D. Jones and Chief Judge Samuel A. Thumma joined.

**W I N T H R O P**, Judge:

¶1　　　　Denisse P. ("Mother") appeals the juvenile court's order terminating her parental rights to A.P., L.P., J.P., and N.P. ("the children") on the statutory grounds of chronic substance abuse and prior removal.[1] *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3), (11).　Mother challenges the sufficiency of the evidence supporting the grounds for severance, including whether the Department of Child Safety ("DCS") made diligent efforts to reunify Mother and the children, and the court's finding that severance was in the children's best interests.　For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[2]

¶2　　　　Mother is the biological mother of the children, who were born in 2003 (A.P.), 2004 (L.P.), 2005 (J.P.), and 2014 (N.P.).[3]　Mother has a history of substance abuse—including methamphetamine and opiates (heroin, codeine, and morphine).

¶3　　　　When N.P. was born in February 2014, her meconium tested positive for methamphetamine and opiates, both of which Mother admitted using during her pregnancy.　DCS offered Mother various services and did not remove the children from the home at that time.

¶4　　　　In September 2014, police arrested N.P.'s father after he physically abused and injured L.P.　When Mother did not take the children to court to testify against N.P.'s father on March 4, 2015, a warrant was issued for her arrest for failure to obey a subpoena.[4]

¶5　　　　Mother was arrested the next day, and DCS took custody of the children.　Although the charges against Mother were later dropped, the

---

[1]　　　The parental rights of the children's fathers, who are not parties to this appeal, have also been terminated.

[2]　　　We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order.　*Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

[3]　　　Mother is also the biological mother of C.R., who was not subject to the dependency and is not a party to this appeal.

[4]　　　N.P.'s father was nonetheless convicted of child abuse and sentenced to eight years' imprisonment.

children remained out of Mother's care. DCS filed a dependency petition and offered Mother supervised visitation, transportation, drug testing, substance-abuse assessment and treatment, parent-aide services, parenting classes, individual counseling with a domestic violence component, family counseling, and a psychological evaluation.

¶6            In May 2015, Mother began intensive outpatient substance-abuse treatment, which required her to attend classes three times a week. In June 2015, she underwent the psychological evaluation and was diagnosed with unspecified personality disorder with borderline and antisocial traits, adjustment disorder with anxiety, and moderate opioid-use disorder.

¶7            In January 2016, the court found the children dependent as to Mother and adopted a case plan of family reunification with a concurrent case plan of severance and adoption as to N.P. Throughout the dependency, Mother struggled with sobriety, and relapsed on methamphetamine in January and February 2016.

¶8            Nonetheless, by April 2017, Mother had successfully completed the substance-abuse program, having progressed through the intensive outpatient program, the standard outpatient program, and the recovery maintenance program. In addition, Mother had by that time participated in and completed urinalysis testing, parent-aide services, individual counseling, parenting classes, and the psychological evaluation, and she continued to participate in family counseling and in-home services with a family preservation team. The children were transitioned back to Mother by May 2017, and in July 2017, the court dismissed the dependency.

¶9            In September 2017, however, Mother overdosed on heroin, and two weeks after that, she overdosed again, passing out on the floor. During Mother's second overdose, L.P., J.P., N.P., and C.R.—who at that time was less than two months old—were in the home, and Mother was their sole caregiver. J.P. flagged down an apartment security guard, who performed CPR on Mother. After police officers arrived, they contacted DCS, which removed the children. C.R. was placed with her father, and the other children were initially placed with their maternal grandmother ("Grandmother"). Shortly thereafter, DCS transferred N.P. to her previous placement after Grandmother indicated she was unable to meet the child's needs.

¶10           In early October 2017, DCS filed a dependency petition for A.P., L.P., J.P., and N.P., alleging Mother could not parent the children due

to substance abuse and mental health issues. That same month, the juvenile court found the children dependent as to Mother for the second time, adopting a case plan of family reunification. DCS again offered Mother services, referring her for substance-abuse assessment and treatment, drug testing, individual counseling, and transportation. DCS also planned to offer psychological and psychiatric evaluations and parent-aide services after Mother had demonstrated thirty days of sobriety. Additionally, DCS offered supervised parenting time with the children; however, the three older children refused to visit with Mother. Consequently, between October and December 2017, Mother visited only N.P. and, even then, when N.P. returned from visits, she would engage in negative behaviors.

¶11 Also in October 2017, Mother's urinalysis sample was positive for morphine, although a hair-follicle sample taken the same day was negative. From October 4 to November 12, Mother missed eight drug tests, then tested positive for heroin, codeine, and morphine on November 13. She submitted to no other drug tests between October and December, and her daily call-in rate to determine if she had to test was only twenty-six percent. She admittedly continued to use drugs "[o]ff and on" during that time.

¶12 In the latter part of 2017, Mother failed to appear for substance-abuse assessment and treatment, and she was closed out of the service due to lack of contact. Also, although Mother submitted to an intake for individual counseling in October, she attended only one session in November and one in December before she was closed out of that service due to lack of contact.

¶13 On December 15, 2017, police officers arrested Mother after she was charged with four counts of contributing to the dependency or delinquency of a child, charges arising from her second September overdose. She was released approximately fourteen hours later, but Immigration and Customs Enforcement ("ICE") officials immediately detained her.

¶14 While detained by ICE, Mother sent a letter to DCS for N.P., but DCS did not give N.P. the letter because her therapist recommended against it. The children continued to tell the case manager they did not want contact with Mother, and Mother did not send letters for the other children; however, between January and April 2018, Mother wrote three letters to the case manager expressing concern about them. Sometime in February or March, the DCS case manager learned the ICE facility would not facilitate in-person visits between Mother and the children.

¶15            In February 2018, the juvenile court changed the case plan to severance and adoption.  DCS then moved to terminate Mother's parental rights on the grounds of a history of chronic substance abuse and prior removal, *see* A.R.S. § 8-533(B)(3), (11), and the court set the severance hearing for July 25, 2018.

¶16            In May 2018, Mother wrote to the DCS case manager and inquired for the first time whether the children could visit her at the ICE facility.  In June 2018, pursuant to a court order, A.P., L.P., and J.P. appeared by video conference at Mother's immigration hearing.

¶17            On July 5, 2018, ICE released Mother from detention.  DCS referred Mother for substance-abuse treatment and urinalysis testing, and in the weeks before the severance hearing, Mother reengaged with TERROS Families F.I.R.S.T., taking substance-abuse classes and scheduling a parenting class.  She also complied with four urinalysis tests, although she had a diluted test on July 19, which DCS considered "dirty."  Mother also requested visits with the children, but DCS did not immediately arrange visitation because the DCS unit psychologist recommended against it.  Two days before the severance hearing, however, the three older children met with Mother.

¶18            On July 25, 2018, the juvenile court held the contested severance hearing.  After taking the matter under advisement, the court terminated Mother's parental rights to the children on the grounds of chronic substance abuse, *see* A.R.S. § 8-533(B)(3), and prior removal, *see* A.R.S. § 8-533(B)(11), while further finding that severance was in the children's best interests.

¶19            Mother filed a timely notice of appeal.  We have jurisdiction pursuant to A.R.S. § 8-235(A) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

**ANALYSIS**

        *I.        Standard of Review*

¶20            A court may sever parental rights if it finds clear and convincing evidence of one of the statutory grounds for severance and finds by a preponderance of the evidence that severance is in the children's best interests.  *See* A.R.S. §§ 8-533(B), -537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 281-82, 288, ¶¶ 7, 41 (2005).

¶21        As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004)).  Thus, the resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002).  Instead, we review the juvenile court's order to determine if reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7.

### II.        Mother's Challenges to the Court's Statutory Findings

### A.  Prior Removal

¶22        Mother argues the juvenile court erred by terminating her parental rights based on prior removal.  *See* A.R.S. § 8-533(B)(11). Specifically, Mother challenges the court's findings that DCS made diligent efforts to provide appropriate reunification services and that Mother was currently unable to discharge her parental responsibilities.

### 1.  Diligent Efforts

¶23        Under A.R.S. § 8-533(B)(11), the juvenile court may terminate a parent's parental rights to a child if it finds that a child, previously removed from the parent pursuant to court order and then returned to that parent, is again removed within eighteen months of that return if DCS "made diligent efforts to provide appropriate reunification services" and the parent "is currently unable to discharge parental responsibilities."  DCS may satisfy the requirement of diligent efforts if it provides the parent "with the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).  DCS is not required, however, to provide the parent with unlimited time to engage in services. *See Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994).  Further, DCS "is not required to provide every conceivable service or to ensure that a parent participates in each service it offers." *JS-5019040*, 180 Ariz. at 353.  Instead, DCS is obligated to undertake rehabilitative measures with a reasonable prospect of success, rather than measures that are futile. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

¶24        Mother argues DCS did not make diligent efforts to provide reunification services after the children's second removal in September 2017.  She concedes DCS provided her with services before her detention

by ICE, and does not challenge the sufficiency of these services, but argues DCS did not offer her services—most specifically, visitation for her and the children—while she was detained.[5]  At trial, however, Mother's DCS case manager testified DCS "really has no reach in terms of getting services in place in ICE custody," and that when she contacted the ICE facility, she was informed she could not arrange in-person visits.  Further, Mother was released less than one week after counsel for DCS eventually received an e-mail providing the name of a contact who could allegedly arrange visits between Mother and the children with advance notice, giving DCS little time to arrange a visit between Mother and the children.  Moreover, after Mother's September 2017 overdoses and the children's removal, Mother's case manager asked the children monthly if they wanted to visit Mother, but the children declined, and DCS would not force the children to do so.

¶25        Mother further argues DCS did not provide appropriate services upon her release from ICE detention because DCS did not refer her for supervised visits or individual counseling before the July 25 severance hearing.  Mother's DCS case manager explained, however, that DCS had staffed the question of visits between Mother and the children, and the unit psychologist had recommended against providing visits at that time.  The case manager also explained that individual counseling would not have been approved because Mother had already been referred for that service and had been closed out.

¶26        Mother also argues she was afforded only twenty days to participate in services, and thus DCS did not provide her with the time and opportunity to meaningfully do so.  However, Mother's argument ignores the services offered in the months between her overdoses in September 2017 and her arrest in December 2017, as well as the years of services provided in the prior dependency, which she conceded to the juvenile court were part of "the big picture."  Between the beginning of the first dependency in March 2015 and the successful dismissal of that dependency in July 2017, DCS offered Mother a plethora of services, including supervised visitation, transportation, drug testing, substance-abuse assessment and treatment, parent-aide services, parenting classes, individual counseling, family counseling, and a psychological evaluation, as well as transition services such as a family reunification team, funding for housing, and continued services for the children.  At trial, Mother testified those services were helpful and conceded she could think of no additional services DCS should have offered her.  Moreover, after Mother overdosed on heroin in

---

[5]        At the start of the severance hearing, however, Mother conceded she was "not asking DCS to put in services . . . while she's in ICE custody."

September 2017, DCS again offered Mother drug testing, substance-abuse assessment and treatment, individual counseling, supervised visitation, and transportation, with additional services—including psychological and psychiatric evaluations and parent-aide services—contingent on Mother maintaining thirty days of sobriety. As previously noted, however, Mother called in for urinalysis testing only twenty-six percent of the time, tested positive the two times she submitted urine samples, and closed out of her substance-abuse assessment and treatment classes and individual counseling for lack of contact. Her participation during the time before she was detained by ICE was, at best, sporadic, indicating further services would likely have been futile. Moreover, by the time of the severance hearing, the children had been in out-of-home care for a total of approximately thirty-six of the previous forty-one months. As the juvenile court recognized, "[t]he one thing Mother needs to reunify with the Children is to establish consistent sobriety and [DCS] has provided ample services to help Mother do that." In this case, DCS provided Mother with appropriate reunification services and more than ample time and opportunity for her to participate in those services, and reasonable evidence supports the juvenile court's conclusion that DCS made diligent reunification efforts.

### 2. Current Inability to Discharge Parental Responsibilities

¶27 Mother next argues the juvenile court erred in finding she was currently unable to discharge her parental responsibilities. The juvenile court found that, although Mother had apparently "achieved some sobriety while in the restricted environment of federal custody," Mother had proven she was unable to control her substance abuse and she could not discharge her parental responsibilities "because of the very real risk of another relapse or overdose."

¶28 The term "parental responsibilities" refers to those duties or obligations a parent has regarding her child, *Maricopa Cty. Juv. Action No. JS-5894*, 145 Ariz. 405, 408-09 (App. 1985) (citation omitted), and includes providing food, shelter, medical attention, good physical care, and emotional security, *Maricopa Cty. Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 185 (App. 1984). The term does not refer to an exclusive set of factors; instead, it "establish[es] a standard which permits a trial judge flexibility in considering the unique circumstances of each termination case before determining the parent's ability to discharge his or her parental responsibilities." *JS–5894*, 145 Ariz. at 409. DCS need not show the parent is unable to discharge *any* parental responsibilities. *Id.* at 408.

¶29        In this case, Mother engaged in services for more than two years before DCS concluded she had made the necessary behavioral changes, the children were returned to her care, and the court dismissed the first dependency, in part because she was presumably sober. Although Mother told the court there were no additional services DCS should have offered her, only two months after the court dismissed the first dependency, Mother overdosed on heroin with her children in the home while she was their sole caregiver. Rather than seeking help, Mother overdosed a second time on heroin two weeks later, again with the children in the home and again while she was their sole caregiver. The second time, J.P. had to save her by getting help after she had passed out on the floor. Mother acknowledged she should have seen the first overdose as a call to "wake [her] up" to not continue using heroin, but blamed postpartum depression.

¶30        Mother argues she participated in classes while detained by ICE, but she had participated in numerous classes offered through DCS for more than two years and appeared to successfully achieve sobriety before relapsing. Moreover, her case manager testified that participating in approximately four classes through ICE was inconsistent with the services and treatment DCS required, which included a months-long process beginning with an individual assessment and tailored recommendations. Further, although Mother contends that, while detained, she learned to be stronger and ask for help, she admitted at trial she had already learned to ask for help and to access resources during the first dependency, but then did not seek help when she needed it. When asked what was different at the time of trial from when she had relapsed on heroin, she blamed her depression at the time she relapsed. When asked how she could assure the court she would not relapse again if something else happened to depress her, she told the court she had been clean for three years and "[i]t's not like I decided to have postpartum depression." Her purported sobriety at the time of trial does not establish that she has her substance-abuse issues under control, particularly given that, to the extent she achieved sobriety, she did so in the restricted and controlled environment of ICE detention.[6]

¶31        The record reveals Mother's pattern of abusing drugs, participating in services, and relapsing, which would present an ongoing risk to children in her care. The juvenile court found Mother's explanations inadequate to show she had achieved long-lasting sobriety, and reasonable evidence supports the court's conclusion that the risk of another relapse or

---

[6]        Moreover, as previously noted, Mother admittedly had a diluted urinalysis test—which DCS considered "dirty"—only six days before the severance hearing.

overdose was "very real" and rendered Mother currently unable to discharge her parental responsibilities.

### B.   Chronic Substance Abuse

**¶32**        Mother also argues the juvenile court erred in terminating her parental rights pursuant to A.R.S. § 8-533(B)(3), the statutory ground of chronic substance abuse.

**¶33**        However, "[i]f clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M.*, 203 Ariz. at 280, ¶ 3 (citations omitted); *see also* A.R.S. § 8-533(B) (requiring that evidence sufficient to justify the termination of the parent-child relationship include "any one" of the enumerated termination grounds).   Because we conclude that reasonable evidence supports the court's decision to terminate Mother's parental rights under A.R.S. § 8-533(B)(11), we do not address this argument.

### III.    Best Interests

**¶34**        Finally, Mother argues the juvenile court erred in finding that severance was in the children's best interests.

**¶35**        The juvenile court must consider a child's best interests when considering a motion to terminate a parent's parental rights.   A.R.S. § 8-533(B).   Until a court finds a ground to terminate parental rights, the parent and child "share a vital interest in preventing erroneous termination of their natural relationship."   *Kent K.*, 210 Ariz. at 285, ¶ 30 (quoting *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)).   In a best-interests inquiry, however, the court may "presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (quoting *Kent K.*, 210 Ariz. at 286, ¶ 35).   Consequently, the focus turns to the child's interests. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 15 (2016) (holding that, at the best-interests stage of the analysis, the child's interest in stability and security must be the court's primary concern (citations omitted)).

**¶36**        With that in mind, the best-interests inquiry must include either "a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the [parent-child] relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990).   A court must consider the totality of the circumstances existing at the time of the severance

determination, *Alma S.*, 245 Ariz. at 150-51, ¶ 13 (citation omitted), while recognizing that a child may benefit if a current adoptive plan exists for the child, *see JS-500274*, 167 Ariz. at 6, if DCS can show the child is adoptable, *Alma S.*, 245 Ariz. at 150-51, ¶¶ 13-14, or if the child "would benefit psychologically from the stability an adoption would provide," *JS–501904*, 180 Ariz. at 352. The court may also consider evidence that an existing placement is meeting the needs of the child in determining that severance is in a child's best interest. *Demetrius L.*, 239 Ariz. at 4, ¶ 12; *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998). Additionally, the court may consider that, in most cases, the continued presence of a statutory ground for severance will have a negative effect on the child. *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013) (quoting *Maricopa Cty. Juv. Action No. JS–6831*, 155 Ariz. 556, 559 (App. 1988)). Thus, "[t]he existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98-99, ¶ 12 (App. 2016) (citing *Bennigno R.*, 233 Ariz. at 351, ¶ 30).

¶37        Mother suggests the adoption of the children is unlikely because three of them are more than twelve years old, and therefore, they would need to consent to any adoption. *See* A.R.S. § 8-106(A)(3). But the record contains no evidence the older children would not consent. A.P. and J.P. were in an adoptive placement that was meeting their needs and where they had lived for three years. Further, these same children refused to visit Mother after her September 2017 overdoses.[7] And although Mother correctly points out that J.P. told the case manager he missed Mother and wanted to return to her, the other children made no similar comments, and there is no evidence that any of the children—including J.P.—ever indicated they would withhold consent to an adoption.

¶38        Mother also argues that N.P.'s and L.P.'s behavioral issues might prevent them from being adopted. Mother's case manager agreed that both children were "struggling a lot with physical symptoms of trauma," but noted they are "great kids" and "sweet kids" whose needs were being met by their placement, and she further testified that they were receiving trauma counseling, behavior coaching, and crisis stabilization services, and L.P. was also receiving individual counseling and medication

---

[7]        Citing evidence to the contrary, Mother argues the record does not support her case manager's testimony that the children did not want to see her. Weighing the evidence and resolving conflicts in the evidence, however, is uniquely within the province of the juvenile court. *Jesus M.*, 203 Ariz. at 282, ¶ 12.

management for his ADHD. She testified that DCS planned to start the process of finding both children a permanent home after they had received further stabilization therapy. She also testified that N.P.'s struggles with attachment and behavioral issues started during her visits with Mother in October and November 2017, and opined that continued contact with Mother would increase the severity of the problem. Finally, the case manager testified that all four children were adoptable.

¶39 Moreover, in determining the best interests of the children, the juvenile court found the children were "not safe—physically or emotionally—in Mother's care" due to her inability to overcome her substance abuse, and therefore concluded that continuing the children's relationship with Mother would harm them. Although Mother characterizes this conclusion as mere "speculation," we disagree. In the first dependency, Mother successfully completed services and reunited with her children, but then twice overdosed on heroin while she was the children's sole caregiver, putting the children at risk of harm and ultimately requiring J.P. to summon help to save her life. Further, she has had multiple opportunities to address her substance-abuse issues and multiple relapses. The court's finding that terminating Mother's parental rights was in the children's best interests is supported by reasonable evidence in the record.

## CONCLUSION

¶40 The juvenile court's order terminating Mother's parental rights to the children is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA