692 P.2d 1027

**In the Matter of the APPEAL IN MARI-COPA COUNTY JUVENILE ACTION NO. JS–5209 AND NO. JS–4963.**

**Nos. 1 CA–JUV 246, 1 CA–JUV 247.**

Court of Appeals of Arizona,
Division 1, Department B.

Oct. 23, 1984.

Barry M. Hatch, Phoenix, for appellant Mother.

Kim D. Gillespie, Coolidge, for Children.

Robert K. Corbin, Atty. Gen., by C. Eileen Bond, Asst. Atty. Gen., Phoenix, for Arizona Dept. of Economic Security.

## OPINION

JACOBSON, Chief Judge.

This is an appeal by the natural mother from an order of the trial court terminating her parental rights.

The mother's problems in rearing her children were formally recognized in May 1975, when a dependency petition was filed on behalf of her six minor children. The petition alleged abuse and neglect by both parents. It was alleged that the mother had been physically abusing the children because of acute distress and that she was in need of psychiatric help.

At that time, the investigating social worker observed bruises on the face, back and legs of the two youngest children and the mother admitted she had inflicted some of the injuries herself. The social worker referred the mother to a mental health clinic for psychotherapy. All of the children were removed from the home by child protective services and subsequently, on August 19, 1975, they were adjudicated dependent by the court. The four youngest children have remained in foster care since being found dependent, except for a short period in 1976 and 1977 when they were returned to the custody of their fa-

ther. They were subsequently removed from the father's custody and returned to foster care when it was established that they had suffered additional abuse while in his custody. It also appeared that the mother had known about the abuse by the father but had not reported it.

Calvin, the next to oldest child, was returned to his mother's custody in 1976 and the dependency petition, as it related to him, was dismissed by the court. Calvin has lived with his mother since that time. The oldest child, Terry, after having been adjudicated dependent, was also adjudicated incorrigible and was assigned to a series of residential treatment facilities. Terry voluntarily returned to live with his mother in March of 1983. He was 18 in November of 1983.

The mother herself was physically and sexually abused and neglected as a child and she lived in foster homes from ages 7 through 18. In 1975 she received psychiatric care, including psychotherapy from Phoenix South Community Mental Health Center, where she was diagnosed as having a depressive neurosis. The trial court found that throughout the course of the dependency proceedings the mother received, or was offered various services by the Department of Economic Security, including family counseling, personal counseling, and group therapy, to improve her skills as a parent. At one point, Dr. DiBacco, one of the mother's treating physicians, suggested that a course of psychotherapy should be tried in order to better evaluate the mother. Such one-on-one psychotherapy by a certified psychiatrist or psychologist was never offered to the mother, however. In June 1982, the case worker was ordered by the court to draw up a social contract outlining the steps the mother should take in order to regain custody of the children. This agreement was never signed or pursued. Instead, in July 1982, a petition to sever parental rights was filed in regard to the two girls. A similar petition was filed in regard to the younger two boys in December of 1982. The petitions were consolidated for trial.

After a hearing, the trial court entered its order terminating the parent-child relationship between the four minor children and their natural father and mother.[1] The court found that:

The evidence is clear and convincing that [the mother] is unable to discharge her parental responsibilities because of a mental illness and mental deficiency, and that her mental illness and mental deficiency, and the inability to discharge parental responsibilities caused thereby, will continue for a prolonged indefinite period.

The mother's appeal from the trial court's order terminating her parental rights raises the following issues:

1. Whether the evidence was clear and convincing that she was unable to discharge her parental responsibilities.

2. Whether the evidence was clear and convincing that she is mentally deficient.

3. Whether the evidence was clear and convincing that she suffers from a mental illness.

4. Whether the Department of Economic Security failed in its duty to attempt rehabilitation.

5. Whether the severance is in the best interests of the children.

6. Whether A.R.S. § 8–533(B) is unconstitutionally vague because it does not define the terms "mental illness" or "mental deficiency".

## CONSTITUTIONALITY OF
## A.R.S. § 8–533(B)

We first answer the mother's argument concerning the constitutionality of the statute under which her parental rights were terminated. A.R.S. § 8–533(B)(3) establishes, as a ground for termination,:

That the parent is unable to discharge the parental responsibilities because of mental illness, mental deficiency or a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to be-

lieve that the condition will continue for a prolonged indeterminate period.

The mother argues that because Title 8 of the Arizona Statutes dealing with child welfare contains no definition of what constitutes a mental illness or a mental deficiency, A.R.S. § 8–533(B)(3) is unconstitutionally vague. She maintains that as a result of this failure to define the terms, parents are not given adequate notice of what illness might deprive them of their children and further, that the lack of such definitions leaves the determination of mental illness to the subjective determination of judges or mental health experts. In the mother's view, this is constitutionally unacceptable.

The mother also complains that, at least as applied in this case, the statute is overbroad because the mental health experts who testified concerning the mother's mental condition at trial relied upon the definition of mental disorder found in the Diagnostic and Statistical Manual of Mental Disorder, DSM III, published by the American Psychiatric Association (DSM III). DSM III includes within its definition of "mental disorder" such conditions as stuttering, sleepwalking, and premature ejaculation. The mother's argument is that obviously such conditions would not be a legitimate basis for the termination of parental rights and that therefore the definition of "mental disorder" is overbroad.

■ The vagueness and overbreadth arguments are founded upon the due process clause of the Fourteenth Amendment to the United States Constitution. It is now well established that a parent's right to the custody and control of his or her children is a fundamental right guaranteed by the United States Constitution. *See Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pima County Juv. Action J–46735*, 112 Ariz. 170, 540 P.2d 642 (1975); *Pima*

---

**1.** The natural father voluntarily relinquished his parental rights and consented to the children's

adoption.

*County Juv. Action S–111,* 25 Ariz.App. 380, 543 P.2d 809 (1975).

■ Statutes terminating parental rights must therefore comport with basic due process requirements guaranteed by the Fourteenth Amendment. A statute whose terms are vague and conclusory does not satisfy due process requirements. *See Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Davis v. Smith,* 266 Ark. 112, 583 S.W.2d 37 (1979); *In Interest of Lewis,* 257 N.W.2d 505 (Iowa 1977).

■ "Vagueness" and "overbreadth", however, are separate and distinct concepts. A statute is unconstitutionally vague if it fails to give "a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or if it allows for arbitrary and discriminatory enforcement by failing to provide an objective standard for those who are charged with enforcing or applying the law. *Grayned v. City of Rockford, supra.* This vagueness test is applicable to parental rights termination cases as parents are entitled to notice of what type of conduct will cause them to lose the custody and control of their children. *See Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10 (S.D.Iowa 1975), *aff'd* 545 F.2d 1137 (8th Cir.1976). The state argues, however, that the notice requirement of the vagueness doctrine has little relevance in this case because the appellant's parental rights are not being terminated because of *willful* conduct for which notice must be given, (*see* A.R.S. § 8–533) but rather because of the mother's *inability* to be an effective parent caused by her mental illness. Notice therefore is irrelevant since notice of the conduct would not have enabled the mother to alter her mental condition.

■ We agree that the notice requirement of the vagueness doctrine is not really the issue here. However, the doctrine has another aspect which is applicable: The statute's failure to provide explicit standards which can lead to arbitrary and discriminatory parental terminations; this would violate due process. *See Grayned, supra; Davis v. Smith, supra; In the Matter of J.N.M.,* 655 P.2d 1032 (Okla. 1982). As the mother's arguments embrace this contention, we must therefore consider whether the failure of A.R.S. § 8–533(B) to define the terms "mental illness" and "mental deficiency" leaves it open to such arbitrary application that it must be found to be unconstitutionally vague.

■ We start from the well established principle that there is a strong presumption in favor of the constitutionality of a legislative enactment. *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977); *New Times, Inc. v. Arizona Board of Regents,* 110 Ariz. 367, 519 P.2d 169 (1974). *See also State v. Grijalva,* 111 Ariz. 476, 533 P.2d 533 (1975). In keeping with this principle, a statute will not be held void for vagueness if any reasonable and practical construction can be given to its language. *In re Baby Boy T,* 9 Cal. App.3d 815, 88 Cal.Rptr. 418 (1970). Simply because a term is not defined does not render the statute unconstitutional. *Ahearn v. State,* 588 S.W.2d 327 (Tx.Cr.App. 1979); *People v. Obertance,* 432 N.Y.S.2d 475 (1980). In determining whether a statute is vague, the required meaning may be derived from an established technical or common law meaning of the language in question. *People v. Lakey,* 102 Cal.App.3d 962, 162 Cal.Rptr. 653 (1980).

The mother's argument focuses upon two contentions in arguing that the statute fails to provide sufficient standards to avoid arbitrary application—the lack of statutory definitions and the necessity to rely upon expert testimony to define the terms in question. We turn first to the lack of definition argument.

We agree that the term "mental illness" is not statutorily defined within the confines of Title 8. However, as previously pointed out, this is not fatal if the required standard may be ascertained from the language utilized. *People v. Lakey, supra.* The mother concedes, and we agree, that in

order for a termination to occur under A.R.S. § 8–533(B)(3), three specific findings must occur:

1. That the parent is unable to discharge the parental responsibilities;

2. That this inability is the result of a mental illness or a mental deficiency;

3. That there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period.

Thus, under our statute, a finding of mental illness or mental deficiency alone is not a justification for the termination of parental rights. *Cf. In the Matter of J.N.M., supra. In re Kidd,* 261 N.W.2d 833 (Minn.1978); *In the Matter of J.L.B.,* 182 Mont. 100, 594 P.2d 1127 (1979) (mental illness alone is not a constitutionally sufficient basis for the termination of parental rights). Rather, it must also be established by clear and convincing evidence that the mental illness or mental deficiency is such that it prevents the parent from discharging parental responsibilities. Further, there must also be evidence to support a finding that the illness is so severe and substantial that it will continue for an extended and indefinite period of time.

We therefore hold that the term "mental illness" under the statute is defined as "a substantial mental condition which renders the person unable to discharge parental responsibilities and which condition is likely to continue for a prolonged indeterminate period." In our opinion such a definition comports with constitutional requirements that an objective standard be set for termination of parental rights.

We are supported in this conclusion by other courts which have considered similar arguments.

In *Lakey, supra,* the California Court of Appeal found that the failure of a criminal statute to define the term "mental disorder" did not render that statute unconstitutionally vague because the term had a sufficiently precise technical meaning. In *In the Matter of Salem,* 31 N.C.App. 57, 228 S.E.2d 649 (1976), the court upheld the constitutionality of the state involuntary commitment statute finding that the term "mental illness" was "capable of being understood and objectively applied with the help of medical experts." *Id.* 228 S.E.2d at 651. The North Carolina statute questioned in *Salem, supra,* did contain a definition of "mental illness" but the respondents asserted that the term as defined was vague. (The term was defined as "an illness which so lessens the capacity of the person to use his customary self-control, judgment, and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under treatment, care, supervision, guidance or control.) *See also, People v. Taylor,* 618 P.2d 1127 (Colo.1980) ("mentally ill persons" means "persons who are of such mental condition that they are in need of supervision, treatment, care or restraint"); *In re Beverly,* 342 So.2d 481 (Fla.1977) ("mentally ill means having a mental, emotional, or behavioral disorder which substantially impairs the person's mental health").

The mother next argues that the statute is impermissibly vague since it requires expert testimony to determine whether the individual falls within the statutory standard. No authority is cited for this proposition and our independent research has failed to uncover any case supporting that position. Compare, in *In re Baby Boy T, supra,* cited by the mother in support of her contention that lack of statutory definition renders the statute unconstitutionally vague, where the California court depended upon expert testimony to establish that the parent's "mental condition" makes the parent "in need of supervision, treatment, care or restraint." *See also, In the Matter of Salem, supra.* We therefore reject the contention that because proof of the standard is established by expert testimony the statute becomes so subjectively suspect as to render it unconstitutional.

We also note that in order for the statute to be held constitutional, it is

not necessary that it contain a checklist of every mental illness that will cause a termination of parental rights. *See In re Interest of Metter,* 203 Neb. 515, 279 N.W.2d 374 (1979). We hesitate to find A.R.S. § 8–533(B)(3) unconstitutionally vague when the courts of other jurisdictions have upheld similar or even more broadly drawn statutes. *See, e.g., In re Interest of Metter, supra; see also* Model Statute for the Termination of Parental Rights drafted by the Neglected Children Committee of the National Council of Juvenile Court Judges, 27 Juv.Just. (1976). Under the circumstances we cannot say that any greater specificity was possible. *See In the Interest of Lewis,* 257 N.W.2d 505 (Iowa 1977) ("due process does not require more specificity than is reasonably possible under the circumstances"); *see also Jordan v. DeGeorge,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951). It should be recognized, however, that the clear and convincing evidence standard employed in parental termination cases, serves to protect the parent's right from being too easily terminated based upon standards that may not be very precise. *See Santosky v. Kramer, supra.*

■ We also believe that the requirements of A.R.S. § 8–533(B)(3): 1) That the parent suffers from a mental illness that causes him or her to be unable to discharge the parental responsibilities; 2) that the parent is unable to discharge the parental responsibilities, and 3) that there is reasonable grounds to believe that the condition will continue for a prolonged indeterminate period, implies proof of actual or likely harm to the child, thereby lessening arbitrary or discriminatory application. The statute does not provide for severance of parental rights merely because it is thought that a child might be better off in a different environment, *see In the Matter of Appeal in Maricopa County Juvenile Action No. JS–734,* 25 Ariz.App. 333, 543 P.2d 454 (1975), rather a danger to the child's welfare must be shown in the form of the parent's inability to care for the child. *Cf. Matter of Maricopa County Juvenile Action No. JD–561,* 131 Ariz. 25, 638 P.2d 692 (1981) (state may intrude into parent-child relationship to protect welfare of child).

Although the mother raises the issue of whether the term "parental responsibilities" is unconstitutionally vague only in passing, since we are relying on the requirement that the parent be unable to discharge these responsibilities to limit the scope of A.R.S. § 8–533(B)(3), we address the question of whether that term, also not defined in the statute, is unconstitutionally vague.

■ The requirement that statutory language must be reasonably certain is satisfied "by the use of ordinary terms which find adequate interpretation in common usage and understanding," *In re Interest of Metter, supra,* or if the term can be given meaning by reference to other definable sources. *In re Baby Boy T, supra.*

■ We find that the term "parental responsibilities" is capable of being understood by persons of ordinary intelligence as referring to those duties or obligations which a parent has with regard to his child. Although we recognize that individuals may disagree as to exactly what "responsibilities" a parent owes to a child in a given situation, we believe that the term is susceptible to a sufficiently precise definition.

■ Every parent has the right to the care, custody and control of his or her minor child. *Angius v. Superior Court,* 6 Ariz.App. 68, 429 P.2d 702 (1967). A.R.S. § 8–531 defines "custody or legal custody" as "a status embodying the following rights and *responsibilities:* (b) The duty to protect, train and discipline the child, and (c) the responsibility to provide the child with food, shelter, education, and ordinary medical care...." Accordingly, a parent's legal duty to support ⸰his minor child (A.R.S. § 12–2451) has been held to include providing the child with food, shelter, and medical attention. *See Branham v. State,* 33 Ariz. 170, 263 P. 1 (1928). In addition, it has been held that a child's right to proper parental care include the right to good physical care and emotional security. *See*

*Matter of Maricopa County Juvenile Action No. JD–561*, 131 Ariz. 25, 638 P.2d 692 (1981). Therefore, common understanding, statutory definitions and prior decisions give sufficient meaning to the term "parental responsibilities" so as to meet constitutional standards of certainty and specificity.

■■■ We now turn to the mother's "overbreadth" argument. The evil to be avoided by overbroad statutes is that the net may be so large that it snares the innocent as well as the guilty. *State v. Smith*, 310 Or.App. 749, 571 P.2d 542 (1977). However, in order to have standing to raise this issue, the mother must fall within the alleged overbroad category. *See State v. Smith*, 130 Ariz. 74, 634 P.2d 1 (1981). The mother argues that the DSM III definition of "mental disorder" (a term used interchangeably with "mental illness" by the experts) includes such conditions as stuttering, sleepwalking and premature ejaculation which she contends have no legitimate basis for terminating parental rights. Without conceding the correctness of this assumption, we note that the mother's parental rights were not severed because she suffered from any of these conditions, and therefore she lacks standing to make this particular overbreadth argument.

■■■ Moreover, we note that A.R.S. § 8–533, as applied to the mother was given a sufficiently limiting interpretation so as to bring the statute within constitutionally permissible bounds. *See Alsager v. District Court of Polk County, Iowa, supra.*

The trial court recognized that the "mental illness" or "mental deficiency" of the parent must be severe and substantial. *See Pima County Juv. Action No. S–111, supra* (mental illness "must be serious and substantial"), and it found that the mother's illness met this criteria. The trial court also found that parental responsibilities included "providing for the basic physical needs of the child including food, clothing, shelter, safety and medical needs," and

providing for the child's "emotional nuturance, educational and social needs."

■■■ The doctors who testified at the hearing stated that the mother was prevented by her mental illness from discharging her parental responsibilities to the four youngest children. They identified the responsibilities she was unable to discharge and described how the characteristics of her mental illness impaired her ability to carry out her parental duties. Finally, the doctors testified that her mental condition and her inability to be an effective parent would continue for a prolonged indeterminate period of time. Based upon this, we find that A.R.S. § 8–533(B)(3), as applied in the instant case, is not unconstitutionally vague.

## ABILITY TO DISCHARGE PARENTAL RESPONSIBILITIES

The mother argues that the evidence was not clear and convincing that she was unable to discharge her parental responsibilities. She points to the fact that Calvin has been under her care, custody and control since 1976. Dr. Richard Daehler, a child psychiatrist, performed a psychiatric interview on Calvin within the 18 months prior to the hearing. He testified that in his opinion Calvin had not been adequately stimulated to achieve his optimal potential, nor had he received adequate psychological nuturing from his mother. Nevertheless, Dr. Daehler's opinion was that Calvin had been "minimally adequately parented" by appellant.

The mother argues that since there is evidence that she is capable of "minimally adequately parenting" the one child who is in her custody, the evidence is not clear and convincing that she would be unable to discharge her parental responsibilities to the four younger children. We do not agree.

The trial court found that the expert medical testimony established that although the mother might be able to provide for the basic physical needs of the children for food, clothing and shelter, she would be unable to provide for their safety or medi-

cal needs, nor could she provide for any of their emotional needs because of her mental illness. At the hearing Drs. Jalowsky, DiBacco, Gould and Bencomo all agreed that she would not be able to provide for the educational, emotional, social or psychological needs of her children and was not capable of formulating and applying consistent discipline for the children. They testified that because of the mother's difficulty in differentiating between fantasy and reality, one of the characteristics of her mental illness, she would be unable to appreciate the children's daily needs.

The doctors also testified that the mother's mental condition and consequently her ability to discharge her parental responsibilities would deteriorate under even moderate stress. The stress in her life would increase with the number of children in her care. The experts agreed that because of this inability to deal with stress, the potential for further abuse and neglect of the children would be high if they were returned home.

 Because of the relationship established between additional stress and the mother's ability to discharge her parental responsibilities, the fact that appellant is able to minimally act as an adequate parent for one child does not mean that she would be able to care for the other four children. The evidence indicated that the mother would be best able to parent an older child who was more independent. Therefore, the fact that the mother is able to care for Calvin, who is 16, does not necessarily mean that she could adequately parent the four younger children, particularly the two younger boys who have special parenting needs. The mother herself acknowledged her inability to care for the boys. We find that the evidence is clear and convincing that appellant is unable to discharge her parental responsibilities.

## EVIDENCE OF MENTAL ILLNESS

Appellant also argues that the evidence is not clear and convincing that she suffers from a mental illness. We have previously held that the term "mental illness" as used

in the termination statute requires that the condition must be of such a nature as to prevent the parent from discharging her parental responsibilities and there must be reasonable grounds to believe that the illness will continue for a prolonged indeterminate period.

In determining whether the mother suffered from such a "mental illness," the trial judge sought guidance from A.R.S. § 36–501.17, which defines the term "mental disorder" for purposes of chapter 5 of Title 36, dealing with mental health. The experts all testified that the term "mental illness" and "mental disorder" were used interchangeably.

A.R.S. § 36–501 provides:

"17. 'Mental disorder' means a substantial disorder of the person's emotional process, thought, cognition or memory. Mental disorder is distinguished from:

(a) Conditions which are primarily those of drug abuse, alcoholism or mental retardation, unless, in addition to one or more of these conditions, the person has a mental disorder.

(b) The declining mental abilities that directly accompany impending death.

(c) Character and personality disorders characterized by lifelong and deeply ingrained anti-social behavior patterns, including sexual behaviors which are abnormal and prohibited by statute unless the behavior results from a mental disorder.

The trial judge also looked to the Diagnosis and Statistical Manual of the American Psychiatric Association, DSM III, relied upon by the experts.

DSM III defines mental disorder as a:

[C]linically significant behavioral or psychological syndrome or pattern that occurs in an individual and that typically is associated with either a painful symptom (distress) or impairment in one or more important areas of functioning (disability), in addition, there is an inference that there is a behavioral, psychologic or biologic dysfunction, and that the disturbance is not only in the relationship be-

tween the individual and society. When the disturbance is limited to a conflict between an individual and society, this may represent social deviance, which may or may not be commendable, but is not by itself a mental disorder.

The experts, although differing in their diagnosis, all testified that appellant suffered from a mental disorder based upon the classification of mental disorders in DSM III. The mother's mental condition was diagnosed by the different experts as a paranoid personality disorder, an atypical personality disorder with schizotypal and borderline features, a schizotypal personality disorder with borderline and dependency features, a mixed personality with schizotypal and dependency features and a borderline personality disorder with schizotypal and dependency features.

Pointing to the expert's testimony that she suffers from some type of "personality disorder" and the exclusion of "personality disorders" from both the statutory and DSM III definitions, the mother argues that her condition does not fall within the definition of mental illness.

■ First, the mother maintains that a personality disorder does not qualify as a substantial disorder. This conclusion is not supported by the evidence. All of the doctors who testified found the appellant's mental illness to be a longstanding and severe disorder and one that was resistive to treatment. They testified that psychotherapy would not be of any benefit, nor was there any medication that was effective in controlling or improving her condition.

The evidence established that the mother's mental illness is characterized by schizophrenic type symptoms including magical thinking, paranoid idealization, general suspiciousness, infantile fantasy and poor reality testing. She manifests instability, bizarre behavior and cognitive confusion. As a result of her illness, the mother is unable to deal with even moderate stress. She is incapable of forming a mature adult nondependent relationship with another person.

It is apparent from the evidence that the mother's mental illness is a substantial one.

We do note that the definition of mental disorder found in A.R.S. § 36–501 does provide that "a mental disorder is distinguished from ... character and personality disorders." The statute, however, does not exclude all personality disorders from the definition of mental disorders, but only those "characterized by lifelong and deeply ingrained anti-social behavior." This definition is entirely consistent with the DSM III definition of mental disorder, which provides that "when the disturbance is limited to a conflict between the individual and society, this may represent social deviance, which may or may not be commendable, but is not itself a mental disorder."

The problem with the mother's contention that her "personality disorder" falls within these exceptions, is that it simply is not supported by the evidence. We have previously described the mother's mental condition and it need not be repeated here. Suffice it to say that her condition is not merely "antisocial behavior" or "social deviance."

Here, we adopt neither the definitions of mental disorder found in A.R.S. § 36–501 or DSM III. We prefer to limit our definition to that of a mental condition of long duration which prevents the discharge of parental responsibilities. Further, we find nothing in either A.R.S. § 36–501 or DSM III which would prohibit the mother's "personality disorder" from being classified within our definition of mental illness.

We therefore find that the evidence is clear and convincing that the mother suffers from a "mental illness."

EVIDENCE OF MENTAL DEFICIENCY

The mother also maintains that the evidence was insufficient to support the trial court's finding of mental deficiency. At oral argument, the state conceded that there was not clear and convincing evidence to support this finding. Since A.R.S. § 8–533(B)(3) requires a showing of *either* a "mental illness" *or* a "mental deficiency," and since we have already concluded that

there was sufficient evidence to support the finding of mental illness, we need not consider whether the mother also has a mental deficiency.

## DEPARTMENT'S FAILURE TO ATTEMPT TO REHABILITATE

The mother next maintains that DES failed in its duty to attempt to rehabilitate her and therefore the severance should not be granted. She argues that because she was never offered psychotherapy, DES failed to make a sufficient effort to rehabilitate the mother and preserve the parent-child relationship. The mother notes that DES was ordered by the court in June of 1982 to draw up a social contract outlining the steps necessary for the mother to take in order to regain custody of the children. That agreement was never signed nor pursued, but instead in July of 1982, DES filed a petition to sever the parental rights.

 Arizona courts have recognized that severance of the parent-child relationship should be resorted to "only when concerted effort to preserve the relationship fails." *Matter of Appeal in Maricopa County Juv. Action No. S–111*, 25 Ariz. App. 380, 387, 543 P.2d 809, 817 (1975), *see also Arizona DES v. Mahoney*, 24 Ariz. App. 534, 540 P.2d 153 (1975). Nevertheless, we do not believe that the failure of DES to provide the mother with ongoing psychotherapy should preclude termination in this case. First, the doctors testified that the mother was not likely to benefit from psychotherapy. We do not believe that the department's duty to attempt to preserve the family goes so far as to require it to undertake efforts which are futile. Second, the evidence supports the trial court's finding that the mother was provided with family and personal counseling and group therapy to improve her parenting skills. The experts confirmed that this type of therapy offered the most hope for enabling the mother to carry out her parental responsibilities. Based upon this, we find that DES did not fail in its duty to attempt to preserve the parent-child relationship.

## SEVERANCE IS NOT IN THE BEST INTERESTS OF THE CHILDREN

Finally, the mother argues that severance should be denied as the evidence does not show that it would be in the children's best interest. We disagree. The evidence clearly shows that the mother is unable to discharge her parental responsibilities and that the mental condition which prevents her from doing so is likely to continue for a prolonged indeterminate period. Under these circumstances, the trial court found that it was in the children's best interest that they be freed for adoption. There is sufficient evidence to support this finding.

Based on the foregoing we find that there was clear and convincing evidence to support the termination of parental rights in this case.

The judgment is affirmed.

MEYERSON, P.J., and OGG, J., concur.