NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TONI T., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, E.T., *Appellees.*

No. 1 CA-JV 20-0409
FILED 8-31-2021

Appeal from the Superior Court in Maricopa County
No. JD32007
The Honorable Todd F. Lang, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Tom Jose
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding Judge Peter B. Swann and Judge David D. Weinzweig joined.

---

**M c M U R D I E**, Judge:

¶1             Toni T. ("Mother") appeals from the termination of her parental rights to her child, Emily.[1] For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2             Mother is the biological parent of four children, Bobby, Nathan, Sarah, and Emily.[2] Shortly after Emily's birth, the Department of Child Safety ("DCS") received a report alleging that Mother was neglecting Emily by failing to feed, change, and hold her. The reporter alleged that Mother was not interacting or bonding with Emily, and Mother appeared to be developmentally delayed. This report was abandoned, and DCS did not respond.

¶3             In January 2016, DCS received a second report alleging that Mother was neglecting Emily. In this report, a doctor who examined Emily diagnosed her with severe failure to thrive because she had gained only 14 ounces from birth and weighed two ounces less than when she was seen earlier in the month. When questioned, Mother told the doctor that Emily did not have feeding problems, but she spit up a lot. The doctor prescribed medication for Emily and ordered a blood test and follow-up visit, but Mother failed to attend the visit. After two home visits by nurses in mid-January, Emily still had not gained weight, and Mother was instructed to call the doctor and make an appointment. Instead, the reporter alleged that Mother took her phone outside and merely pretended to make one. When asked if she understood the dangers associated with a failure to

---

[1]       We use pseudonyms to protect the children's identities.

[2]       Mother's parental rights to the other children were not terminated, and Emily's father is not a party to this appeal.

thrive diagnosis, Mother responded that she did, "but not really." The reporter asserted that Mother might be "mentally delayed."

¶4 This time, DCS responded to the report and removed Emily and the other children from Mother's home. During the removal process, DCS noted many concerns with the condition of the home, including (1) Bobby and Nathan's beds were covered in urine; (2) Nathan was observed crawling in and out of a bedroom window; and (3) the refrigerator in the home did not operate properly and contained spoiled food. After removing the children, DCS took Emily and Sarah to Phoenix Children's Hospital, where they were hospitalized for six days because of malnutrition.

¶5 DCS petitioned for an out-of-home dependency alleging that Mother neglected Emily by failing to provide for her basic needs, "including adequate food, a fit and proper home, and appropriate parental care and supervision." The juvenile court determined Emily was dependent as to Mother. Over the next four years, DCS provided Mother with several reunification services, including rule-out drug testing, transportation, four parent-aide referrals, three psychological evaluations, and counseling. But after her first psychological evaluation in September 2016, Mother was diagnosed with a mild intellectual disability.[3] As a result, the juvenile court consistently ordered DCS to provide Mother with specialized parent-aide services to accommodate Mother's disability during the following years.

¶6 Eventually, the court ordered DCS to provide Mother with a "master's level" parent aide. Unfortunately, DCS could not find a master's-level parent aide. To satisfy the spirit of the order, DCS referred Mother for other services involving professionals with master's degrees.

¶7 In December 2017, the juvenile court granted Mother's motion to transfer custody of Emily and Nathan from foster care to the children's maternal grandmother ("Grandmother"), with whom Mother resided. After nearly a year of placement with Grandmother, however, Emily and Nathan were removed from her care after DCS discovered that she had

---

[3] As discussed below, further testing determined that Mother's condition was more than mild. Mother has a full scale IQ score of 67, which places her at only the first percentile of adults within the normative sample. Meaning that Mother functions at about a 2-year-old to 13-year-old level.

violated the safety plan by permitting Mother's brother to reside in the home secretly. DCS returned Emily to her previous foster home.

¶8　　　　As the dependency progressed, and despite her substantial compliance with nearly all services provided by DCS, Mother struggled to improve her parenting skills. Each of the four parent-aide referrals provided to Mother was closed out because she could not enhance her protective capacities as a parent. And the psychologists who examined Mother generally concluded that her intellectual disability severely limited her ability to parent, placed the children at risk of neglect, and that it was unlikely that further reunification services would prove successful at improving Mother's parenting skills.

¶9　　　　So in May 2019, DCS moved to terminate Mother's parental rights under the mental-deficiency and fifteen months' time-in-care statutory grounds. A.R.S. § 8-533(B)(3), (B)(8)(c). In October and November 2020, the juvenile court held a four-day termination hearing on DCS's motion, during which several professionals involved in Mother's case and Mother testified. After the hearing, the court issued a detailed ruling finding that DCS had successfully shown that termination of Mother's parental rights was warranted under both the mental-deficiency and fifteen months' time-in-care grounds.

¶10　　　Mother appealed, and we have jurisdiction under A.R.S. § 8-235(A) and Arizona Rule of Procedure for the Juvenile Court 103(A).

¶11　　　While Mother's appeal was pending, the juvenile court discovered it had inadvertently failed to record the second day of the termination hearing, during which two witnesses for DCS testified. Because a transcript of the proceedings could not be produced without the recording, we revested jurisdiction for the court to reconstruct the record.

¶12　　　The juvenile court proposed that the parties submit preliminary findings describing the testimony presented on the missing day, followed by an oral argument to resolve conflicts. Mother's counsel objected and asked the court to recall the witnesses to testify, citing the need to create an adequate record for Mother's appellate counsel and claiming that she did not take detailed notes of the testimony. In the alternative, Mother's counsel requested that DCS's counsel file proposed findings, and she could raise any challenges to the statement at oral argument. The court rejected Mother's first request, finding that recalling the witnesses would not serve the interests of judicial economy. But it granted Mother's second request and ordered DCS to prepare a statement, provide a draft to

Mother's counsel for feedback, and then file it with the court before oral argument.

**¶13** The parties filed joint findings agreeing with the summation of events provided in the court's December 2020 ruling. During oral argument, DCS's counsel explained that he had found the court's order to be a "perfect summation of what occurred on the 16th of October" and, after talking with the other parties, "they indicated they had no objection to that and no addition." When queried by the court, Mother's counsel again stated that she believed that recalling the witnesses was a more prudent means to reconstruct the lost record but stated she had worked with DCS's counsel and decided to "use the [juvenile] court's interpretation of the matter." The court noted Mother's objection. Still, it adopted DCS's statement "as a record of the testimony, facts, and findings from October 16th that will replace the lost transcript."

## DISCUSSION

**¶14** To support the termination of parental rights, DCS must prove one or more statutory ground for termination by clear and convincing evidence. A.R.S. § 8-537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *ADES v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). "[W]e do not re-weigh the evidence on review." *Jesus M. v. ADES*, 203 Ariz. 278, 282, ¶ 12 (App. 2002). We review the court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. ADES*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

### A. The Juvenile Court Did Not Err by Reconstructing the Record Without Recalling Witnesses.

**¶15** Mother first argues the court erred by reconstructing the record "with a written submission rather than having the witnesses recalled for testimony." Mother contends that, given the nature of her case and trial counsel's inability to challenge DCS's statement, the summary of the

proceedings described in the court's statement is inadequate to afford her a meaningful appeal.[4] We disagree.

**¶16**          Arizona Rule of Procedure for the Juvenile Court 104(F)(2) provides that "any dispute . . . about whether the record discloses what actually occurred in the juvenile court" must be "submitted to and resolved by the juvenile court." Generally, "when portions of a trial record are not available because they no longer exist, the appellate court should reinstate the superior court's jurisdiction for reconstruction of the record and thereby provide the appellant a reasonable opportunity to pursue the appeal." *In re Colton P.*, 242 Ariz. 437, 439, ¶ 11 (App. 2017) (citing *Rodriquez v. Williams*, 104 Ariz. 280, 282–83 (1969)). And Arizona Rule of Civil Appellate Procedure ("Appellate Rule") 11 outlines several methods through which the parties and court can reconstruct the record when a transcript is unavailable, including a narrative or agreed-upon statement. ARCAP 11(d), (e); *see also* Ariz. R.P. Juv. Ct. 103(G) (ARCAP 11(d) and (e) apply to "appeals from final orders of the juvenile court.").

**¶17**          The juvenile court did not err by reconstructing the record through a narrative statement rather than recalling the witnesses who testified on that date. Because it presided over the termination trial and is explicitly tasked with resolving disputes over the record, the juvenile court, and not this court, is best positioned to decide what methods will adequately compensate for the loss of missing transcripts. *See Rodriquez*, 104 Ariz. at 283 (recognizing that procedures to restore records "can best take place in the trial court"); *see also* Ariz. R.P. Juv. Ct. 104(F)(2). *But see State v. Sahagun-Llamas*, 248 Ariz. 120, 123–24, ¶¶ 12, 16 (App. 2020) (refusing to defer to superior court's approval of narrative statement, partly because the court had no memory of the proceedings). For that reason, the dispositive question before us is not whether the court could have used a better reconstruction method but whether the record is complete enough for "adequate consideration of the errors assigned." *State v. Schackart*, 175 Ariz. 494, 499 (1993).

---

[4]      Mother highlights several alleged issues arising from her termination hearing because it was conducted virtually. Because Mother does not argue how other deficiencies independently require reversal or adequately explain how they undermine the reconstructed record, we do not address them. ARCAP 13(a)(7)(A); *In re J.U.*, 241 Ariz. 156, 161, ¶ 18 (App. 2016).

**¶18**        Here, the juvenile court correctly followed the procedures outlined in Appellate Rule 11(d) by ordering DCS's counsel to prepare a statement describing the evidence introduced at the October 16 proceedings. *See* ARCAP 11(d) ("[A]ny other party" may prepare a narrative statement if the appellant does not.). Mother was given several opportunities to object or propose amendments to the narrative statement's content under the rule. She never did and instead joined DCS in agreeing with "the summation of facts in the ruling . . . on December 14, 2020, as to what was testified [to] on October 16, 2020." And although Mother's ability to challenge the narrative statement was hampered by counsel's difficulty recalling the trial's events, that fact alone did not require the court to recall witnesses or nullify Mother's decision to stipulate to the statement's accuracy. *See Rodriquez*, 104 Ariz. at 283 (Recalling witnesses may be appropriate "if a point arises upon which the parties cannot agree and the trial judge cannot remember.").

**¶19**        Moreover, the record before us—including the stipulated narrative statement, certified transcripts of the other days of the termination hearing, and extensive documentary evidence—is more than adequate to review Mother's arguments on appeal. Thus, the juvenile court's decision to utilize means other than recalling the witnesses to reconstruct the record did not deprive Mother of an adequate opportunity to pursue her appeal.

**¶20**        Analogizing her case to our recent decision in *Sahagun-Llamas*, 248 Ariz. 120, Mother contends that the stipulated narrative statement is inadequate. But Mother's reliance on *Sahagun-Llamas* is misplaced. There, we held the State's attempt to reconstruct a day of a defendant's criminal trial more than *16 years* after the proceedings through a narrative statement could not "afford [the] defendant a meaningful right of appeal" and remanded the case for a new trial. *Sahagun-Llamas*, 248 Ariz. at 123, ¶ 11 (quoting *Schackart*, 175 Ariz. at 498–99). In so holding, we specifically noted that besides the sheer amount of time between the date of the proceedings and the State's reconstruction efforts: (1) the court expressly acknowledged that it could not assist the parties or adequately review the narrative statement for accuracy; (2) the narrative statement contained discrepancies and was not based on the personal recollection of the parties involved in the case; and (3) the missing transcript concerned the heart of the defense's case and undermined the court's ability to review the sufficiency of the evidence comprehensively. *Id.* at 123–26, ¶¶ 12, 14–15, 21–23.

**¶21**        In this case, by contrast, the parties and court's efforts to reconstruct the record occurred only a few months after the October 16 proceedings, curtailing any concerns surrounding the accuracy of their

recollections. *See State v. Masters*, 108 Ariz. 189, 192 (1972) (noting that a reconstructed record based on the party's memory of proceedings that occurred around six years earlier "would probably not be of much aid to the appellate court"). The record also shows that the juvenile court took notes at the termination trial and summarized the evidence presented in its ruling. Thus, the court was willing and able to take an active role in settling and approving the stipulated narrative statement as an accurate evidentiary summation under Appellate Rule 11(d). Finally, the testimony presented at the October 16 proceedings was merely a component of DCS's case rather than a critical element of Mother's defense. Simply put, this case is a far cry from the situation presented in *Sahagun-Llamas*.

## B.     The Juvenile Court Did Not Abuse Its Discretion By Finding DCS Provided Mother With Adequate Reunification Services.

**¶22**     Next, Mother contends the court abused its discretion by finding that DCS fulfilled its obligation to make reasonable and diligent efforts to provide reunification services to her under the mental-deficiency and fifteen months' time-in-care grounds. *See Vanessa H. v. ADES*, 215 Ariz. 252, 255–56, ¶ 18 (App. 2007) (reasonable efforts required under mental-deficiency ground); A.R.S. § 8-533(B)(8)(c) (diligent efforts required under fifteen months' time-in-care ground). Mother argues DCS failed to make reasonable and diligent efforts by not supplying her with parent-aide services until seven months after the case began and disregarding the juvenile court's orders for DCS to provide her a master's level parent aide. Mother also asserts these deficiencies constituted a failure to reasonably accommodate her intellectual disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213.

**¶23**     Before terminating a parent's rights to his or her child under the mental-deficiency ground, DCS has both a constitutional and statutory obligation to make reasonable efforts to reunify the family. *Mary Ellen C. v. ADES*, 193 Ariz. 185, 191–92, ¶¶ 29–34 (App. 1999). "[W]hen moving to terminate a parent-child relationship under one of the time-in-care grounds, DCS must show that its efforts were not only reasonable but also diligent." *Donald W. v. DCS*, 247 Ariz. 9, 22, ¶ 47 (App. 2019) (emphasis omitted). To satisfy the "reasonable efforts" requirement, DCS is obliged to "undertake measures with a reasonable prospect of success" and "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Mary Ellen C.*, 193 Ariz. at 192, ¶¶ 34, 37. Likewise, to prove it made diligent efforts, DCS must, at a minimum, "identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of

success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W.*, 247 Ariz. at 23, ¶ 50. That said, DCS does not have to provide "every conceivable service" to a parent or "undertake rehabilitative measures that are futile." *Mary Ellen C.*, 193 Ariz. at 192, ¶¶ 34, 37.

**¶24** In addition, "[a]s a public child welfare agency, DCS must provide a disabled parent in a dependency with reunification services that comply with the ADA." *Jessica P. v. DCS*, 251 Ariz. 34, 38, ¶ 14 (App. 2021). Efforts that satisfy Arizona's statutory and constitutional requirements also meet the ADA's reasonable accommodation standard because, to make reasonable efforts, the State must seek to accommodate disabilities from which a parent may suffer. *Id.* at 39, ¶ 15. Courts must, therefore, consider whether reasonable accommodations have been made for a disabled parent as a component of DCS's obligation to make reasonable and diligent efforts. *See id*.

**¶25** Here, the juvenile court made detailed findings about the frequency and adequacy of the services provided by DCS to Mother from the time Emily was first removed from her care to the date of the termination hearing. As for parent-aide services, the court found that Mother had been provided with four different parent-aide referrals, and each had been closed unsuccessfully because of Mother's inability to enhance her protective capacities as a parent. The court also specifically addressed DCS's failure to comply with its orders to provide her with a master's-level parent aide and concluded that DCS had still met its obligations under A.R.S. § 8-533 and the ADA. The court noted that all witnesses who testified at trial were unaware of a master's-level parent aide. All the same, the purpose of the court's order was to ensure Mother's intellectual disability was "accommodated in teaching her parenting skills," which had been accomplished by the services DCS *did* provide.

**¶26** Because reasonable evidence supports the court's findings, we cannot say the court abused its discretion by concluding that DCS provided appropriate reunification services to Mother despite DCS's initial delay in delivering her parent-aide services and its failure to comply with the court's previous order. To be sure, the seven-month delay between DCS's initial referral for parent-aide services in January 2016 and the start of those services in July 2016, which DCS attributed to a shortage of parent aides during that period, is concerning. If DCS had moved to terminate Mother's parental rights before providing her reasonable time and opportunity to participate in parent-aide services, our conclusion might

differ. But considering the circumstances surrounding Emily's removal and Mother's intellectual disability, the court did not err. Before the termination hearing, DCS provided Mother with four separate parent-aide referrals. Each parent aide had worked with Mother for several months before the service was closed out unsuccessfully.

¶27 As for the failure to provide Mother with a master's-level parent aide, the court was well within its discretion to conclude that DCS made both reasonable and diligent efforts to provide Mother with services designed to accommodate her intellectual disability. The supervisor assigned to Mother's case testified that DCS made several attempts to find and give Mother a master's-level parent aide, but that each attempt proved fruitless because parent aides with such qualifications did not exist. Other witnesses testified that they have never heard of a specialized master's-level parent aide. In addition, each parent aide assigned to Mother testified at the termination hearing that they were informed that Mother had an intellectual disability and made specific efforts to modify their behavior and techniques to accommodate her. These efforts included breaking down multi-step lessons into single steps, repeating and going over concepts several times, describing or conveying information in more than one way, providing examples, and modeling appropriate behavior to Mother.

¶28 From February to May 2018, DCS also provided Mother with a family preservation team. This service included a master's-level therapist and another professional with a master's degree to supply Mother with more specialized assistance with her parenting. Finally, for most of September 2019 through September 2020, DCS included Emily's master's-level child therapist in Mother's supervised visitation to provide her with more specialized assistance in learning to parent Emily safely.

¶29 We conclude the court did not err by finding that DCS met its obligation to make reasonable and diligent efforts to provide Mother with adequate reunification services under the mental-deficiency and time-in-care grounds—including its duty to make reasonable accommodations under the ADA.

C. **DCS Did Not Have to Prove that Mother Engaged in Culpable Conduct to Terminate Her Parental Rights, and Sufficient Evidence Supports the Juvenile Court's Findings.**

¶30 Finally, Mother argues the juvenile court erred by concluding that DCS proved, by clear and convincing evidence, that termination of her

parental rights was warranted under the mental-deficiency and fifteen months' time-in-care grounds for two reasons. First, Mother contends that the evidence did not rise to the level of "culpable conduct" necessary to terminate her rights under either ground, and the court instead improperly granted termination based solely on her inability to meet Emily's "emotional needs." Second, Mother asserts the juvenile court improperly terminated her rights only because of her intellectual disability, but not based on evidence that she was unfit to parent Emily.

**¶31** Because the maintenance of the parent-child relationship is a fundamental right, due process requires that "a court find, by clear and convincing evidence, parental unfitness when a severance is contested." *Alma S. v. DCS*, 245 Ariz. 146, 150, ¶ 9 (2018). In Arizona, the substantive statutory grounds for termination listed in A.R.S. § 8-533(B) "are proxies for parental unfitness because they demonstrate a parent's inability 'to properly parent his/her child.'" *Id.* at ¶ 10 (quoting *Roberto F. v. ADES*, 232 Ariz. 45, 54, ¶ 42 (App. 2013)). These grounds "address the most serious instances of parental abuse, neglect, or incapacity." *Id.*

**¶32** The parental unfitness inquiry is incorporated in the elements for both the mental-deficiency and fifteen months' time-in-care statutory grounds. To justify termination under the mental-deficiency ground, DCS must show the parent (1) has a "mental deficiency"; (2) is "unable to discharge parental responsibilities" because of this mental deficiency; and (3) there are "reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3). This court has held that these elements require that "a danger to the child's welfare . . . be shown in the form of the parent's inability to care for the child," and that termination cannot be granted merely "because it is thought that a child might be better off in a different environment." *Maricopa County Juv. Action No. JS-5209 and No. JS-4963*, 143 Ariz. 178, 185 (App. 1984).

**¶33** To justify termination under the fifteen months' time-in-care ground, DCS must prove (1) the child has been in an out-of-home placement for a cumulative period of fifteen months or longer; (2) DCS has made a diligent effort to provide appropriate reunification services to the parent; (3) that despite DCS's diligent efforts, the parent "has been unable to remedy the circumstances that cause the child to be in an out-of-home placement"; and (4) there is a "substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). As for this ground, we have held that termination may be granted only if the circumstances the parent has

failed to remedy are ones that "indicate[] parental unfitness." *Donald W.*, 247 Ariz. at 18, ¶ 27.

**¶34**        DCS did not have to introduce evidence of Mother's mental state. Although some statutory grounds for termination may require proof of culpability to establish parental unfitness, the mental-deficiency and fifteen months' time-in-care grounds do not. *See, e.g.*, A.R.S. § 8-533(B)(8)(a) (requiring proof that the parent has "substantially neglected or wilfully refused" to remedy circumstances under nine months' time-in-care ground). And evidence of a particular mental state is not generally required to show that a parent is unfit. *See Maricopa County Juv. Action No. JS-7359*, 159 Ariz. 232, 236 (App. 1988) ("The State's interest in finding the child an alternative permanent home arises only when it is clear that the natural parent cannot or will not provide a normal family home for the child.") (emphasis omitted) (quoting *Santosky v. Kramer*, 455 U.S. 745, 767 (1982)).

**¶35**        As for Mother's other assertions, we agree with the general proposition that a parent's failure to provide a child with adequate emotional support or the mere fact that a parent has an intellectual disability, without more, is insufficient to terminate his or her parental rights. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents[.]" *Santosky*, 445 U.S. at 753. Arizona recognizes explicitly that parents have an inalienable right to parent their children "without obstruction or interference from this state." A.R.S. § 1-602(A), (D); *see also Donald W.*, 247 Ariz. at 20, ¶ 36. It is only when "the interest of the state is great enough—that is, [when] the welfare of the child is seriously jeopardized—[that] the state may act and invade the rights of the parent and the family." *Cochise County Juv. Action No. 5666-J*, 133 Ariz. 157, 161 (1982).

**¶36**        Thus, absent evidence that the parent's failure to provide emotional support to a child seriously jeopardizes the welfare of the child—in cases involving "emotional abuse" as defined by A.R.S. § 8-201(2), for example—allegations of unfitness based on a parent's lack of affection or love for a child are insufficient, standing alone, to permit termination of a parent-child relationship. *See Donald W.*, 247 Ariz. at 28, ¶ 81 ("The severance statute does not permit termination of a parent-child relationship based on the lack of a bond."). The state cannot hinge the deprivation of a fundamental right only on imprecise and overly subjective inquiries into

what makes a parent more loving, affectionate, or nurturing than others.[5] And such considerations are especially suspect in cases involving disabled parents, who may struggle to conform their expressions of love and affection toward their children to societal norms through no fault of their own. *Cf. Cabinet for Health & Fam. Services v. K.S.*, 585 S.W.3d 202, 222 (Ky. 2019) (Lambert, J., dissenting) (condemning termination of mildly intellectually disabled parent's rights "built entirely on the assumption that a person with mild cognitive deficits cannot parent").

¶37 Likewise, the state cannot terminate disabled parents' rights to their children based only on unfounded speculation that their disabilities make them incapable of being a fit parent. *See No. JS-5209 and No. JS-4963*, 143 Ariz. at 185; *K.S.*, 585 S.W.3d at 225 (Lambert, J., dissenting) ("It is clear error to make a finding of intellectual disability without a measurement of adaptive ability, building a house of cards on speculation as to the risk of some future neglect or abuse."). Instead, DCS must show by clear and convincing evidence that a parent's disability renders them incapable of discharging their "parental responsibilities" by providing "proof of actual or likely harm to the child." *No. JS-5209 and No. JS-4963*, 143 Ariz. at 185.

¶38 After reviewing the record and the court's ruling here, however, we are convinced that Mother's parental rights were not terminated based solely on her perceived lack of emotional support for Emily or the mere fact of Mother's intellectual disability. This is not to say that the issues raised by Mother about DCS's case and the court's ruling lack merit. For example, several witnesses for DCS testified that their *primary* concern with Mother was her inability to meet Emily's emotional needs or engage in a bond with Emily. These witnesses inferred that Mother was unfit based on observations that she did not engage with Emily or provide her with appropriate praise and affection. The court's written findings about the mental-deficiency ground also discussed Mother's inability to "understand the importance of a parent's emotional support for her children" and her failure to obtain "the skills to provide the level of emotional support that [Emily] requires."

---

[5] Of course, it is appropriate for the court to consider evidence of the bond between a parent and child once it finds the parent unfit and moves to the best-interests stage of the termination analysis. *See Alma S.*, 245 Ariz. at 150–51, ¶ 13 ("Courts must consider the totality of the circumstances existing at the time of the severance determination" when considering whether termination is in the child's best interest.).

¶39        But the juvenile court's findings and conclusions on the fifteen months' time-in-care ground do not refer to Mother's emotional support of Emily. Instead, the court found that Mother had not remedied the circumstances that caused Emily to remain in out-of-home care at the time of the hearing because she failed "to demonstrate the parenting skills necessary for [Emily] to be safely placed with her." A.R.S. § 8-533(B)(8)(c). The court also found that Mother's intellectual disability was the cause of her inability to remedy the circumstances and that her disability undermined any substantial likelihood that she could effectively exercise parental care and control in the near future. *Id.* Thus, the court did not terminate Mother's parental rights to Emily under the fifteen months' time-in-care ground because she was intellectually disabled, but because her intellectual disability rendered her incapable of resolving the allegations of parental unfitness that caused Emily to be dependent.

¶40        And if Mother's argument can be read as a challenge to the sufficiency of the evidence supporting the court's ruling about the fifteen months' time-in-care ground, reasonable evidence in the record supports the court's findings and conclusions. As correctly identified by DCS and the court, the circumstances causing Emily to remain in out-of-home care throughout the four-year dependency were (1) the neglect which led to Emily's diagnosis for severe failure to thrive and hospitalization for malnutrition just over three months after her birth; and (2) Mother's inability to recognize the dangers associated with that event. Although the record shows that Mother attended nearly all services provided by DCS, many were closed out unsuccessfully because she could not make the behavioral changes necessary to show that Emily would not be at risk for further neglect in her care.

¶41        DCS introduced psychological evidence. Dr. James Thal reported that Mother's performance on an intensive IQ test led to a "Full Scale IQ score of 67," which placed Mother at only the 1st percentile of adults within the normative sample. Based on these results and his informal assessment of her adaptive skills, Dr. Thal found that Mother could not parent independently, her cognitive deficits would "limit her parenting abilities for the foreseeable future," and Mother would be "unable to respond consistently to her children's basic needs."

¶42        Dr. Joseph Bluth administered an adaptive behavior test to Mother to determine whether Mother's intellectual disability caused deficits in her adaptive functioning. Dr. Bluth reported that the test results showed that Mother suffered from severe to mild deficits in every category of adaptive functioning. Overall, Mother "functions from about the

2-year-old level to the 13-year-old level." During the termination hearing, Dr. Bluth also testified that although Mother could likely do "very basic tasks like feeding [Emily] and clothing her," she would probably find it difficult to know "what to do in a new situation that she . . . hasn't encountered."

¶43        On this record, there was ample evidence from which the court could reasonably conclude that termination of Mother's parental rights was warranted because Mother's intellectual disability rendered her unable to remedy the continuing risk of neglect which caused Emily to remain in out-of-home care. Accordingly, the juvenile court did not err by terminating Mother's parental rights under the fifteen months' time-in-care ground. Thus, we need not address the court's findings and conclusions on the mental-deficiency ground. *See Jesus M.*, 203 Ariz. at 280, ¶ 4 ("If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds.").

**CONCLUSION**

¶44        We affirm the juvenile court's judgment.



AMY M. WOOD • Clerk of the Court
FILED:     AA